LEWELLING & PRICE-WILLIAMS v. ST. FRANCIS COUNTY ROAD IMPROVEMENT DISTRICT No. 1.

Opinion delivered April 2, 1923.

1. CONTRACTS—EFFECT OF BREACH.—The failure of one party to comply with a contract absolves the other from performance.

2. CONTRACTS—FORFEITURES—WAIVER.—Continuance of operations under a road-building contract constituted a waiver of past forfeitures.

3. HIGHWAYS—REINFORCED CONCRETE.—Where a road-building contract called for three classes of concrete work, namely, class A, class B and class C, and provided that all reinforced concrete should belong to class A, the road district breached its contract when it refused to classify reinforcement work in class A.

4. HIGHWAYS—ROAD-BUILDING CONTRACT—CONCLUSIVENESS OF ENGINEER'S FINDING.—Under a road construction contract whereby the parties stipulated to abide by the decision of the engineer, the engineer is authorized to settle disputed questions of fact or to interpret ambiguities in the contract which are dependent on issues of fact, but he is not authorized to change the contract by arbitrary interpretation or to refuse allowances based upon plain and unambiguous terms of the contract.

5. HIGHWAYS—ROAD-BUILDING—STRIPPING OF GRAVEL PIT.—Under a stipulation in a road construction contract that the road district "will pay for all stripping ordered by the engineer of overburden or unsuitable material from gravel pits from which gravel is taken for road surfacing purposes," the contractor is entitled to recover for the "overburden" only where the gravel is taken for surfacing roads, and is not in any event so entitled where gravel is procured from the bed of a stream on which there is no "overburden."

6. APPEAL AND ERROR—FINDING OF CHANCELLOR—PREPONDERANCE OF EVIDENCE.—In a conflict of testimony between a contractor who

is interested and the engineer who is disinterested, a finding of the chancellor in accordance with the former's testimony will be set aside.

7. HIGHWAYS—PAYMENT FOR OVERHAUL—CONTRACT CONSTRUED.— Under a road-construction contract stipulating for a free haul of materials of one mile from points or locations designated by the engineer, and that "for each mile or fraction thereof in excess of the said one mile free haul that the contractors shall be compelled to haul materials to the site at which they are to be used in the work he shall be paid at the rate per ton mile bid by him for such overhaul," and that "payment for overhaul as above defined shall be the product of the actual number of tons of material incorporated into the completed structure by its distance, in miles and fractions thereof less than one mile, of its center mass from the points or locations designated by the engineer," a finding of the chancellor that the contract meant that the contractor should receive payment, not for each fraction of a mile of overhaul, but only for the average overhaul, *held* sustained by a preponderance of the evidence.

8. CONTRACTS—VIOLATION OF STATUTE.—Under Acts 1917, No. 157, authorizing the issuance of bonds by a road improvement district at not less than par, where the best bid offered was below par, and the contractors paid the bond buyers the difference between the price offered and par value, under an agreement between the contractor and the commissioners of the district that the latter would refund the sum so paid, such agreement was void as an evasion of the statute.

9. HIGHWAYS—BREACH OF CONTRACT—RIGHT TO RETAINED PERCENTAGE.—Where a highway district violated its contract by refusing to pay items due the contractor, the latter was justified in abandoning the work, and thereupon was entitled to recover retained percentage, which, under the contract, was not payable until completion of the contract.

10. HIGHWAYS—ABANDONMENT OF ROAD CONSTRUCTION—RENTAL VALUE OF EQUIPMENT.—Where, upon the abandonment of a road-building project, the contractor permitted the road district to use his equipment to complete the contract upon its agreement to pay a fair rental price therefor, and the equipment was so used for 16 months, after which time it was sold under a mortgage, *held* that the district was liable for the value of the equipment at the time it was sold with 6 per cent. interest, less the amount for which the equipment was sold.

11. COSTS—FEE OF MASTER.—The fee of a master employed in a chancery case to state an account between the parties should be divided between them.

Appeal from St. Francis Chancery Court; *A. L. Hutchins,* Chancellor; reversed.

*Mann & Mann, Moore, Smith, Moore & Trieber,* for appellant.

Appellants, contractors, brought suit against the road improvement district to recover damages for alleged breach of the contract entered into between the contractors and district on November 24, 1917, for construction of certain public roads in St. Francis County. Appellants contend that the district had breached the contract. The question of who breached the contract being the main question herein, the failure of the district to make payments to contractors in accordance with its terms absolved them from its further performance when they quit work on April 2, 1919, in pursuance of their notice to that effect. Provisions of the contract and testimony argued supporting contention and damages resulting to contractors therefrom. District could not deprive contractors of means of performance of the work and then take advantage of the lack of performance caused by their own misconduct, and cancel the contract and take over the completion of the work, as they wrongfully undertook to do, under sec. 16 of the specifications. Not allowed to take advantage of its own wrong and terminate the contract for lack of progress which was occasioned by its own acts. L. R. 5 Com. Pleas 310; A. C. 442; 98 Md. 1; 18 L. R. A. (N. S.) 1248; 37 Court of Claims 428; 98 Ky. 633; 27 S. W. 251; Elliott on Contracts, § 3682; 13 C. J. 606, 607; 93 N. E. (N. Y.) 81; 148 Ark. 181. There is no substantial evidence to support the finding of the chancellor that the contract was breached by the contractors. Neither was there a waiver of any rights by the contractor in agreeing to superintend the completion of the work after it was taken over by the district. This was specially provided against also in the new contract. Contractor is entitled to recover designated amounts, in all $62,205.46.

*J. A. Sherrill,* for appellant surety company.

The district committed the first breach of the contract as to the surety in failing to pay contractor, in accordance with the contract, the amounts due on the monthly estimates from No. 17 to April, 1918, inclusive. It alleged a verbal contract as an excuse, but no agreement of the kind was included in the written contract subsequently executed, which cannot be varied by parol evidence. 129 Ark. 513; 113 Ark 509; 120 Ark. 428; District breached the contract in failing to reserve the 10 per cent. retained percentage as provided by contract. Court erred in decreeing the amount designated as a profit to the district for completing the work as against the surety. The question was not really in issue nor developed. Also breached contract by failing to estimate and pay contractor for amount due April 1, 1919. If permitted and given payments due, the contractor would have finished the job without loss to the surety. *Henslee* v. *Mobley,* 148 Ark. 181. Agreement of Nov. 15, 1918, did not condone breaches theretofore, nor did the conduct of the contractors thereafter constitute a breach justifying the district in taking over work. The district breached the contract thereby. *Henslee* v. *Mobley, supra.* Court rendered judgment for an excessive amount against contractor and surety, and certainly as against the surety.

*W. J. Lanier, Norfleet & Norfleet, Rose, Hemingway, Cantrell & Loughborough,* for appellees.

Court properly held that the contract of November 15, 1918, was a condonation by all parties of the breaches that had previously occurred, not a waiver of the respective rights, however. District had the right to terminate the contract and take over the work, as it did do. Contractor had no right to quit on his claim for gravel overhaul on a limit overhaul basis. Specification on point too plain for construction. As to expert testimony. 212 U. S. 18. Court erred in disregarding findings of the engineer as to allowance for bridge abut-

ments.   Contract provides that, as to amount of work done, engineer's estimate is conclusive, which must stand unless fraud shown.  48 Ark. 522.   Court erred in its allowance for use of mules and equipment after work taken over by district.   No error in the so-called profit allowance to district, except that it was too small. Erred also as to classification of concrete work and allowing contractor for ''stripping at Crow Creek.''   The claim for discount on the bonds is utterly unwarranted, so absurd as to excite surprise at its being urged.   When the surety signed the modified contract, all breaches of the contract prior to Nov. 15, 1918, of which it complains, were condoned and the contract renewed.   Mr. Hargraves was entitled to a reasonable fee, and was paid no more.

*Gray, Burrow & McDonnell,* for appellant, C. P. Rother, trustee.

District committed first breach of the contract in failing and refusing to pay contractors first five estimates for work from Nov. 17, 1917, to April 28, 1918, inclusive.   Court erred in its construction of § 31 of the specifications relative to ''overhaul.''   Contract construed most strongly against party who prepared it. 151 Ark. 81, 235 S. W. 1001; 112 Ark. 1; 115 Ark. 166. Court erred in its holding relative to district's contract to pay contractors discount on bonds, and also in holding contractors were overpaid for earth work on estimates to August 15, 1918.   Erred also in holding agreement of Nov. 15, 1918, a condonation of breaches between that date and April 1, 1919, constituted a breach of the contract justifying the district in declaring it terminated and taking over the work.   Judgment rendered for excessive amount.

McCULLOCH, C. J.   Appellee is a road improvement district in St. Francis County, created by a special statute enacted by the General Assembly at the session of 1917 (act No. 157) for the purpose of improving certain public roads in that county, the road running east and

west between Wheatley, on the western boundary of the county, and Madison, on the St. Francis River, and between Colt, in the northern part of the county, and Bon Air, near the southern boundary, a total mileage of 45.08. The roads were, according to the plans adopted, to be graded and surfaced with gravel, and new bridges and culverts to be constructed, some to be of wood and others of concrete. An engineer was employed to prepare plans and specifications and to superintend the work, and a contract for the construction of the improvement was let to appellants, Lewelling & Price-Williams, a copartnership, with whom became associated another copartnership, Reinman & Wolfort. During the progress of the work Reinman & Wolfort sold out to Lewelling & Price-Williams.

In accordance with the requirements of the bid and contract, the contractors gave a performance bond in the sum of $137,119, with the Aetna Casualty & Surety Company as surety.

Before the completion of the work the contractors quit work, claiming that the district had broken the contract by failing to pay past-due claims for work, estimated and unestimated, and they instituted this action in the chancery court of St. Francis County against the district to have an accounting of the amount due and to recover earned compensation for performance of work under the contract, and for damages on account of the alleged breach of the contract. The suit was brought by Lewelling & Price-Williams, the other parties, Reinman & Wolfort, having, as before stated, retired from the association.

The district filed an answer and cross-complaint, denying that it committed the first breach of the contract or that it was indebted to the contractors in any sum, and, after joining Reinman & Wolfort and the Aetna Casualty & Surety Company as defendants in the cross-complaint, it alleged that the contractors broke the contract and abandoned performance of the work, and that

the district was thereby compelled to finish the work at an increased cost over the contract price, and recovery was prayed in the sum of $137,119 from the contractors and the surety on the bond.

On the final hearing of the cause the court dismissed the complaint of the contractors for want of equity, and rendered a decree in favor of the district on its cross-complaint in the sum of $37,202.60 against the contractors and the surety on the bond, all of whom have appealed, and the district has cross-appealed, claiming that it was entitled to a decree for the recovery of a larger sum than that awarded by the chancery court.

The chancellor made a finding that the contractors broke the contract by quitting work without justification, and, after finding the amount of the increased cost of completing the construction of the improvement, charged the same against the contractors and credited the amount found to be due for earned compensation and for rental of equipment owned by the contractors and used by the district in completing the work, leaving a balance found to be due to the district by the contractors in the sum above mentioned. The court also rendered a decree in favor of the surety over against the contractors.

The witnesses in the case are numerous, and their testimony is quite extensive, the record in the case being very voluminous. It will therefore be impracticable to state the case in lengthy detail, and only a brief outline will be given, so that the disputed facts may be fully understood.

The contract for the construction of the work was awarded on November 15, 1917, and the written contract between the parties was executed on November 24, 1917. The contract is in customary form, and refers to the plans and specifications and contains the usual requirements about giving a surety bond for the performance of the contract. Peterson & Marshall, a firm of engineers, were designated as the engineers of the district in charge of the work, and there were the usual pro-

visions with reference to monthly estimates as the work progressed, and payment of the estimates, after retaining ten per centum until final settlement, the usual reference to the work being done under the supervision of the engineers, and that the engineers should be the arbiters of all disputes.

The work was done, for a time, under the supervision of Mr. Marshall, who retired from the firm and accepted employment elsewhere, and another resident engineer was put in charge of the work.

The contractors began work a short time after the execution of the contract and continued the work until there was a complete abandonment in April, 1919. Controversies arose from time to time between the contractors and the district concerning the interpretation of certain clauses of the contract and as to certain items of compensation claimed by the contractors and disputed by the district. At times the progress of the work was very slow, and the district claims that the contractors broke the contract by failing to prosecute the work with diligence.

During the summer of 1918 a controversy arose between the parties as to the payment for overhaul on gravel used in surfacing. The gravel was to be obtained from three different places in St. Francis County, being designated as Crow Creek, which is a gravel bed near the public road between Forrest City and Madison, and what are known as the Crisp and Blaylock pits, gravel beds situated near the public highway between Forrest City and Colt. The contractors were to be paid what is termed overhaul charges for gravel used in surfacing, and there was a specification that there should be what is termed a free haul of one mile, an allowance being made for the haul beyond that limit. Large quantities of the gravel were shipped by rail from pits to railroad sidings and thence hauled by truck to the points of distribution, and the controversy arose as to whether or not the overhaul charges should be allowed from the sid-

ings where the cars were unloaded or from the pits, after deducting the one mile free-haul. The controversy over this point raged for several months, and, after reaching an acute stage, the engineer of the State Highway Department was called in, and it was finally settled by a new written contract on this subject, specifying that, where it became necessary to ship the gravel by rail, the district should pay the loading and freight charges, and that the hauling charges allowed to the contractor should be from the sidings to the points of distribution, after deducting the one mile free haul. It was further agreed, in consideration of the compromise of the disputed question, that the contractors should pay the sum of $15,000 on the aggregate freight charges for loading and hauling the gravel from the pits to the sidings where the cars were unloaded. This disputed feature of the contract was thus eliminated from the controversy.

The dispute with reference to other items continued, and the evidence shows that the contractors made repeated demands for the allowance and payment of the unpaid claims, the demands extending up to April 2, 1919, when, immediately after a meeting between the commissioners of the district and the contractors, the latter delivered to the board of commissioners a specific demand in writing for the payment of the disputed items, and giving notice that, unless payment was made in accordance with the demand within ten days, the contractors would quit work and begin an action against the district for breach of the contract. On receipt of this communication the commissioners replied in writing, stating, in substance, that there had been unnecessary delay on the part of the contractors in performing the work, and giving notice that, unless the contractors or their surety would, within ten days, proceed satisfactorily with the work and prosecute it to a completion, the commissioners would take charge of the work and complete it. In other words, on the day named, April 2, 1919, each party to the controversy insisted upon its demands and

gave notice to that effect. The district refused to pay the disputed claims, and the contractors refused to proceed with the work, and immediately quit. Thereafter the parties entered into an agreement whereby Mr. Lewelling, one of the contractors, was employed as superintendent at a stipulated price, and that this new contract should not operate against either party as a waiver of their respective claims concerning the breach of the contract and liability growing out of such breach. It was also agreed that the equipment owned by the contractors, consisting of teams, tools, steam shovels and steam rollers and other articles, should be taken over by the district and used in the completion of the contract, a fair rental price to be allowed therefor. There was also a stipulation in the contract that, in the event the contractors quit work, the equipment should not be taken off the work, but might be used by the district in completing the work.

Under this arrangement the district proceeded with the completion of the improvement and it continued up to September, 1920, when the equipment was taken under a mortgage previously executed by the contractors to secure a certain banking institution for borrowed money, and it does not appear in the proof whether any further work was done thereafter or whether the entire improvement was completed.

The primary inquiry is to determine which of the parties to the contract committed the first breach, for the familiar principle is to be recognized that the failure of one party to comply with a contract absolves the other from performance. *Jerome Hardwood Lumber Co.* v. *Beaumont Lumber Co.*, 157 Ark. 220.

The chancery court decided that the contract of November 15, 1918, with reference to the hauling charges on gravel, operated as a condonation of alleged breaches of the contract by the district in failing to make payments, but we think that a discussion of that question is unnecessary. The contractors never claimed advantage

of a breach of the contract on that ground or any other until they gave notice on April 2, 1919, and their continuance of operations under the contract constituted a waiver of past forfeitures. The same may be said with reference to the claim by the district of a forfeiture on the part of the contractors on account of delay in the performance of the work.

The effect of one of the clauses of the contract was to require the district to give notice of the intention to declare a forfeiture, and, pursuant to that requirement, the district gave notice to the contractors on April 2, 1919, that, unless work was resumed within ten days and prosecuted with diligence, a forfeiture would be declared. This was in response to the contractors' notice that they would quit unless their claims for past-due amounts were paid. The attitude of the parties at that time was this: The contractors claimed certain past-due items of indebtedness for work, and declared their purpose to quit unless those demands were acceded to, and they did quit as soon as the demands were refused. On the other hand, the district refused to pay the past-due claims, and notified the contractors to proceed with the work or suffer a forfeiture. It is undisputed that the contractors immediately quit work, and this constituted a breach of the contract, unless their demands for payment of all past-due amounts were justified. If, on the other hand, the demands of the contractors were unjust, they broke the contract by refusing to proceed with the further performance of the contract at that time.

This brings us to the inquiry whether or not the district was in default in refusing to pay to the contractors amounts to which the latter were entitled.

The chancellor found that at that time the district was indebted to the contractors in the sum of $10,136.17, composed of the following items:

1. On account of improper classification of concrete .................................................. $2,152.34
2. Overhaul on lumber ............................................. 552.50
3. Balance owing contractor on estimate No. 15, March 15 .................................................... 2,851.23
4. Underestimate on excavations for abutments ................................................................... 3,380.10
5. For stripping Crow Creek ................................... 1,200.00

Total .......................................................... $10,136.17

An examination of these items and the testimony in regard to them will therefore be made in the order in which they are stated, for the purpose of determining whether or not the finding of the chancellor is correct.

The first item relates to the additional allowance on concrete work. The specifications to which the contract refers calls for three classes of concrete work, namely, class "A," class "B" and class "C." There were specified prices for the concrete work, according to class. This feature of the controversy turns on the question whether or not the contractors were entitled to the classification of a larger amount of class "A" concrete than was allowed them. The specifications with reference to class "A" concrete, after mentioning in detail the kind of material to be used and the manner in which it was to be handled, concludes with the following:

"Unless otherwise directed by the engineer or noted in the plans, all beams, slabs, balustrades and other parts of concrete bridges or culverts above the top of abutments or piers, and in any event where reinforcement is used, shall be made of class 'A' concrete."

According to the testimony in the case, the contractors constructed a sufficient quantity of reinforced concrete, under the direction of the engineer, to entitle them

to the additional amount claimed and found by the chancellor. Under the terms of the contract, according to its plain language, "in any event where reinforcement is used", the character of work shall be class "A" as defined in the contract. In other words, the use of reinforcement determined the classification of the work. It is not shown that the work fell short in any other respect of coming up to the specifications of class "A" concrete. We are of the opinion therefore that the chancellor was correct in his finding that the contractors were entitled to the amount named in this item.

There seems to be no dispute about the next item, for "overhaul on lumber, $552.50." The engineer, Mr. Petersen, who was the principal witness introduced by the district, conceded that the contractors were entitled to it, and estimated the amount due at $550. There was other evidence on the subject, and we are of the opinion that the chancellor's finding was correct.

The evidence also sustains the third item for balance due on the estimate of March 15, 1919.

The fourth item, for underestimate on excavations for abutments of bridges, is sharply contested. There were many changes made by order of the engineers with reference to the size and character of the bridges, and the contract did not cover the excavation work. According to the testimony, while this involved the removal of earth, it could not be done in the ordinary way with teams and scrapers, but had to be done by hand, with shovels. The work was done under the direction of the engineer, but under an agreement with the contractors that compensation would be allowed, or, rather, that it should be paid for by the district as a "force" account; that is to say, at actual cost plus fifteen per centum for profits. According to this agreement, the contractors were entitled to recover $3,380.10, the amount allowed by the chancellor. The engineer, Mr. Petersen, later disallowed the item, but the testimony, we think, shows that the contractors were entitled to it. It is contended by

counsel for the district that the decision of the engineer is final, as the contract makes him the arbiter of all disputed questions. They invoke the rule, often announced by this court, that, where the parties to a construction contract stipulate to abide by the decision of the engineer or architect as the arbiter, such decision can only be disputed for fraud or mistake. *Hot Springs Ry. Co.* v. *Maher,* 48 Ark. 522. Giving full force to this stipulation in the contract and the rule established by this court with reference to such stipulations, it does not confer authority on the engineer to change the contract or to refuse allowances based upon plain and unambiguous terms of the contract. The engineer has, under such stipulation, authority to settle disputed questions of fact or to interpret ambiguities in the contract which are dependent upon issues of fact, but he is not authorized to change the contract, except in the particulars mentioned, and, as we have said, he cannot change the contract by arbitrary interpretation, for the rights of the parties are fixed by contract, and not by decisions of the engineer. *Williams* v. *Board of Directors,* 100 Ark. 166; *Drainage District* v. *Kochtitzky,* 146 Ark. 494.

Our conclusion therefore is that the chancellor was also correct in allowing this item as an amount past due.

We do not think that the evidence shows that the contractors are entitled to the allowance made by the chancellor for the item for stripping the gravel pit at Crow Creek. This item is for stripping or removing the overburden of earth from the gravel. The testimony shows that the gravel at Crow Creek is of a superior kind, and that it lies partly in the bed of the stream, where it is not covered with earth. There is a separate specification for the concrete work at unit prices, the contractors to furnish all the materials, which, of course, includes the gravel to be used in the mixture. It is clear, from this specification, that the contractors were not entitled to any other compensation than that named in this specification,

so far as concerned the handling of material for the concrete structure. The only specification in regard to stripping the gravel pits reads as follows:

"It is herewith understood and agreed that the party of the first part will pay for all stripping ordered by the engineer of overburden or unsuitable material from gravel pits from which gravel is taken for road surfacing purposes, provided that the overburden of the objectionable material in amount and manner is moved and wasted in accordance with the instruction of the engineer, who must be afforded time by the contractor to do the necessary cross-sectioning, both before and after the removal of said material. For overburden or material thus removed by the contractor the latter shall be paid by the party of the first part the actual cost to the party of the second part of doing this work, provided such cost does not exceed 25 cents per cubic yard, which, under the terms of this contract, shall be the maximum price paid for this work. In consideration of the above it is understood and agreed that the contractor will, free of cost to the district and at his own expense, do all clearing and grubbing required on any part of the work by the engineer, whether along right-of-way, borrow-pit or gravel pit."

It will be seen that this specification relates only to gravel taken for surfacing the roads, and does not apply to gravel used for any other purpose. The testimony shows that it was not contemplated that there should be any removal of overburden at Crow Creek, for the reason that the gravel could be procured from the bed of the creek, and that this specification related only to the other gravel pits designated as the Crisp and Blaylock pits. The oral testimony on this subject comes from Mr. Lewelling, one of the contractors, and Mr. Petersen, the engineer, and the chancellor accepted Lewelling's version as correct. Considering the fact that the burden was upon the contractors and that the engineer, Petersen, was not directly interested in the present

controversy, we think that the chancellor should not have accepted the unsupported statement of one of the interested parties, and we decline therefore to approve the allowance of this item.

In addition to the items allowed by the court, the contractors claimed other items which were due and payable prior to the time the contractors quit work, and which the district refused to pay. The principal item on this subject is the sum of $6,109.58, claimed for underestimate on overhaul of gravel for surfacing. This item arises out of the dispute as to the proper interpretation of the contract in regard to compensation to the contractors for hauling gravel for surfacing the road. The contractors were, under the contract, allowed certain prices for hauling material from the point of origin, that is to say, gravel from the pits, but, as hereinbefore explained, there was to be a free haul of one mile, for which no charge was to be made. These specifications (section 31) relating to compensation for the hauling of material in excess of the free haul of one mile (what is termed the overhaul) reads as follows:

"The free haul on all materials incorporated into the work as a permanent part thereof shall be one mile from the points or locations designated by the engineer, from which such material may be obtained by the contractor for delivery and use upon the work. For each mile or fraction thereof in excess of the said one mile free haul that the contractor shall be compelled to haul materials to the site at which they are to be used in the work he shall be paid at the rate per ton per mile bid by him for such overhaul. Payment for overhaul, as above defined, shall be the product of the actual number of tons of material incorporated into the completed structure by its distance, in miles and fractions thereof, less one mile, of its center mass from the points of location, designated by the engineer, as above defined."

The contention of the district is that this section of the specifications provides for what is termed "aver-

age overhaul;'' that is to say, that there should be payment according to the contract price for the average distance of all the material hauled to a given unit. The detail of this plan is to count from the center of the mass, or unit, and allow for the distance from that point back to the limits of the overhaul, by which method the contractor gets paid for all of the material hauled to that unit for the average distance of that unit, which is one-half. On the other hand, it is contended by the contractors that the language of the specifications means what is termed the ''limit overhaul,'' which gives the contractor compensation for the full amount of the contract price per ton on any mile or fraction thereof. Under this method, material hauled any fraction of a mile, however short the distance, in excess of the free overhaul, gives the contractor the right to compensation for a full mile. As we understand it, the difference in the respective contentions of the parties is very material, for payment for the average overhaul would be just half for a unit haul what would be allowed under the other plan. The language of the specifications is, we think, ambiguous; the engineers who testified in the case differed radically as to what the language means. Some of them testified that it means the payment on limit overhaul, and the others testified that it means payment on average overhaul. The chancellor found in favor of the district on this issue, deciding that the contract, read in the light of the interpretation of expert witnesses, meant average overhaul, and refused to allow the additional item claimed by the contractors. The evidence adduced by the district in support of its contention that the contract meant payment for average overhaul seems to preponderate, at least in numbers of witnesses who testified on the subject, and as all of the witnesses who testified on this subject appear to be men of equal intelligence and experience, we do not think that the chancellor erred in his conclusion that the preponderance of the evidence was in favor of the contention of the district. It is insisted,

on behalf of the contractors, that this conclusion works out a highly unjust method of compensation, and one that made it impossible for the contractors to perform the contract at the prices specified. This is, indeed, a circumstance to be weighed in determining what the contract meant, but, after all, we think the preponderance is in favor of the chancellor's finding on the subject. In fact, the whole contract seems to have been an unprofitable one, and the work was completed by the district at largely increased cost, but this does not absolve the contractors from performance, nor does it force upon us such an interpretation of the contract as would afford a profit to the contractors.

The next item presented by the contractors as one which should have been allowed relates to what is termed underestimate on earth work. One item of $2,212.25 is for alleged underestimate on earth work on the Colt and Madison roads, and another is for $5,650 for work on the Bon Air and Wheatley roads.

The preliminary estimates of the engineer, Mr. Marshall, support the claim of the contractors, but the testimony shows that those estimates were merely preliminary, and the final estimates of the engineer, Mr. Petersen, were against the claim, and we are unable to discover that there is any preponderance of evidence against the finding of the chancellor on this issue. In fact, the chancellor found that the contractors had been overpaid in the sum of $5,411 for earth work, and the testimony supports this finding.

Another item for which the contractors claim compensation is the sum of $4,500 as a refund on money advanced on the sale of bonds.

The statute authorized the issuance of bonds up to a certain sum, but further provided that the bonds should be sold at not less than par. When the district was ready to dispose of the bonds, it was found that it could not sell them at par, and the best bid offered was ninety-eight cents on the dollar. The issue of bonds was thus about

to be thwarted on account of failure to obtain the price
required under the statute, and, in order to prevent this,
the contractors offered to pay the bond bidders $6,000,
which was the difference between the price offered and
par, so that the bidders could then change their bid and
offer par value for the bonds. It is claimed that this
was done under an agreement between the contractors
and the commissioners of the district that they would
later refund this sum to the contractors. This arrange-
ment was carried out, the contractors gave their check
to the bond buyers for $6,000, and the bonds were pur-
chased at par. As a matter of fact, the commissioners
later allowed the contractors a refund of $1,500 on this
item, and there is some evidence tending to show that
some of the commissioners had made a promise to Mr.
Lewelling, one of the contractors, that the whole sum of
$6,000 would be refunded in some way before the com-
pletion of the work. The commissioners, however, tes-
tified that there was no such contract made, and that the
amount which was actually paid the contractors was
merely a gratuity. The chancellor found against the
contention of the contractors on this points, and we think
that the preponderance of the evidence supports this
finding. But, even if the testimony clearly showed that
there was a contract for the repayment of this sum, as
contended by the contractors, we are of the opinion that
such contract was void and unenforceable. It was a clear
evasion of the terms of the statute, and, being illegal,
would not be enforced. The statute provides that the
bonds should not be sold for less than par, and the
payment by the contractors to the bond bidders and the
alleged agreement to repay it by the district was merely
a method of evading the statute and enabling the district
to sell the bonds at a price less than par. In any view of
this item, we are of the opinion that the chancellor was
correct in rejecting it.

The first four items allowed by the chancellor as
past due at the time the contractors quit work aggre-

gate the sum of $8,932.17, and it follows from what we have said that the district broke the contract by refusing to pay these items. The refusal to estimate and pay these items constituted a breach of the contract, which, according to well settled principles of law, absolved the contractors from further performance. In other words, they were justified in quitting the work, and the conduct of the district in refusing to pay not only excused the contractors from further performance but released the surety on the bond.

There are two other items allowed by the chancellor to the contractors which were not, however, due and payable at the time the contractors quit the work. One is an item of $2,073.76 for retained percentage, which was not payable until completion of the work, but which the contractors became entitled to when the district broke the contract by refusing payment of past-due amounts. Another item allowed is the sum of $4,856.60 for the value of steel taken over by the district, for which the contractors were entitled to credit. There seems to be little, if any, dispute about the correctness of these items. The chancellor allowed them, and it has not been insisted here that this finding was erroneous.

Adding the aggregate of these two items to the amount allowed by the chancellor for past-due indebtedness, it makes a total of $15,862.93 due to the contractors from the district, from which there should be deducted, according to the finding of the chancellor, the sum of $5,411, the amount overpaid on earth work, which reduces the amount due the contractors to $10,451.93. The item of $5,411 for overestimate on earth work has been heretofore discussed, and the discussion need not be repeated here.

The contractors are entitled to compensation for the use of their equipment which was taken over by the district, and the chancellor allowed a net credit to the contractors of $24,721. The court arrived at these figures from a finding of the length of time in working days the

equipment was used and the price per day for rental of teams, and deducting the price paid for the drivers, and the feed for the teams. In other words, the court found that there were thirty-three mules in the equipment, which were used for 419 working days; that the fair rental value was $8 per team, and that there should be deducted $2.50 per day for drivers, and $1 per day for feed for the teams.

There is some conflict in the testimony as to what constituted the equipment and its condition and value at the time it was taken over by the district. There were several witnesses who testified on this subject—men who saw the teams and other equipment at the time, and who were experienced men on that subject.

There were thirty-one mules and one horse, and the testimony shows that the contractors bought the mules as good animals, but that at the time they were taken over by the district only sixteen of them were good mules, and that the remainder were very inferior and in poor condition, some of them almost worthless. The testimony warranted the finding that sixteen of the mules were worth at that time $300 per head, and while four or five, or maybe more, of the remainder had little, if any, market value, that the whole fifteen others would average a price of about $150. Computing the aggregate value of the mules on the price mentioned above, it would make about $7,000 the value of the mules at that time.

The testimony tends to show that the mules were well taken care of during the period that the district used them, and that there was no depreciation in the condition of the mules during that time, except natural depreciation on account of increased age.

There is no direct testimony showing the market value of the other equipment at the time it was taken over by the district, except as to a steam shovel and a steam roller. Mr. Lewelling testified that the steam shovel was worth $5,000, and that the steam roller was worth $2,000. He also testified that the rental value of the shovel was

$500 per month. The evidence shows very clearly, however, that the equipment was in poor condition; it had lain out, exposed to the weather, all the winter, and had to be put into repair at considerable cost before it could be used. There were wagons, concrete mixers, scrapers, and other tools, a Ford truck, a steam shovel and a steam roller, also a blacksmith shop and a camp outfit, consisting of tents, cooking stove and utensils. It is, to some extent, a matter of conjecture as to what the value of this equipment was. We are of the opinion that the evidence does not justify a finding that it was worth more than $5,000 in its condition at the time it was taken over by the district. This makes a total valuation of the equipment, including the mules, of $12,000, and at the time they were sold under the mortgage the whole property brought $7,000. This was applied on the debt of the contractors to the mortgagee, and was, in effect, a return of this amount to the contractors.

Now, the chancellor has allowed a net rental of $24,721 for this equipment for the period of its use by the district. We think this allowance is not justified. It is a little more than double the value of the property itself. It is true that there is evidence tending to support the finding that the rental of the mule teams was the amount found by the chancellor, but this proof, manifestly, related to rental prices for short terms, and it would have been an improvident contract for the district to make for the payment of any such sum as rental. If the district had wrongfully converted the equipment, it would only have been liable for the market value at the time of the conversion, or if it had purchased the equipment at that time the presumption is that only the fair market value would have been paid for it. Therefore, by analogy, the rental price should in no event exceed the value.

It is shown that the contractors received the value of the equipment through a sale under their own mortgage, and, estimating the original value at the time it was

taken over by the district at $12,000, the contractors were-out in the transaction the sum of $5,000, the difference between the original value and the proceeds which they finally received as a credit on their mortgage debt.

A majority of the court reach the conclusion that the contractors are entitled, under the evidence, to recover, for the use of the equipment, interest at the legal rate (six per cent. per annum) on the value of the equipment as above stated. The reasons upon which this conclusion is based will be stated by Mr. Justice HART in an additional opinion. Mr. Justice HUMPHREYS and the writer do not agree to this conclusion of the majority. It is undoubtedly true, as above stated, that the findings of the chancellor on this feature of the case are not supported by the evidence. It is likewise true that, though there is evidence that the aggregate rental value of teams on a short-term basis is what the chancellor found it to be, we think the rental should not have been figured on that basis. Such a basis is, under the circumstances of this case, obviously unsound. Mr. Justice HUMPHREYS and the writer think, however, that the basis adopted by the majority is equally unsound, and that the amount allowed to the contractors is, under the evidence, entirely inadequate. The equipment owned by the contractors and used by the district was of a character which necessarily depreciated in its use, and an allowance of only six per cent. per annum as rental value is obviously, we think, insufficient, and does not cover the natural depreciation from ordinary wear.

Though the proved rental value was on an erroneous basis, it is clear, we think, that more should be allowed than the amount found by the majority. The sum of $560 for the use of thirty-two head of stock for sixteen months is not enough. That is only about $17.50 each. The testimony that the rental value of the steam shovel was $500 per month is perhaps excessive, but a machine of that character, which cost $5,000, should bear very con-

siderable rental, considering the necessary wear and depreciation.

There was other valuable property, already enumerated in part. We (Mr. Justice HUMPHREYS and the writer) think that the rental value should, under the circumstances, be appraised on the basis, by analogy, of the difference between the value of the property when taken over by the district and when restored to the owners—$12,000 when taken over, and $7,000, the price it sold for under mortgage, which leaves $5,000—with an allowance of legal interest on the total value of $12,000 during the period of use by the district. This would amount to a total allowance of $5,980, with interest from the time the property was restored.

The amount allowed by the majority ($980) for rental of equipment, added to the sum of $10,451.93, allowed for other items as hereinbefore set forth, makes a total of $11,431.93, for which the contractors are entitled to a decree, with interest at six per cent. per annum on the rental from September 1, 1920, to date, and on the other items from April 2, 1919, to date.

The contractors are entitled to recover costs of both courts, except that the item of fee to the master, allowed by the chancellor, should be divided between the two parties, the contractors and the district, for the reason that his services were necessary in stating the account between the parties.

Appellant surety company is, of course, entitled to a decree against the district for its separate costs.

The decree of the chancellor will therefore be reversed, and judgment will be entered here, dismissing the cross-complaint for want of equity, and in favor of appellants, Lewelling & Price-Williams, for the sums hereinbefore mentioned, with costs aforesaid. It is so ordered.

HART, J. A majority of the court is of the opinion that the chancellor erred in holding that the road improvement district wrongfully took charge of the mules,

steam shovel, and road building outfit of the contractors, and in allowing the contractors $24,721 for the usable or rental value of the same.

It appears from the record that both the improvement district commissioners and the contractors claim that the other breached the contract for the construction of the road.

In April, 1919, both the contractors and the commissioners had served notice on each other to that effect, and were threatening to sue each other for damages for a breach of the contract. . Realizing the uncertainties of such a suit, and that the damages suffered by the losing party might be great, an agreement was entered into whereby the district should take over the work and complete the road, and both parties might preserve their legal rights intact. This agreement contemplated that the district should take over the mules, steam shovel and other road equipment of the contractors and use the same in the completion of the road, and that the principal contractor should be superintendent of the work. The road equipment was then taken over and used for 16 months in the construction of the road.

This agreement was evidently made by the parties for the purpose of minimizing their damages in any suit that might be brought in the future for a breach of the contract. Indeed, both parties contemplated that such a suit would be brought, and, under the circumstances, we do not think that the district should be held liable as a wrongdoer in the premises.

It is true that in an action for replevin as to property having a usable value by way of bailment for hire, like horses or tools, the measure of damages is the value of the use during the detention, and, in cases of conversion, in the absence of proof of special damages, the ordinary measure of damages is legal interest on the value of the property in addition to the value of the property itself. *Kelly* v. *Altemus*, 34 Ark. 184. In short, in conversion the owner is entitled to recover as damages

legal interest on the value of the property, and in re-
plevin, where the property has a usable value, the value
of its use.   Where the plaintiff in replevin fails to prove
any amount of damages he has sustained, he is entitled
to nominal damages only.   *Smith* v. *Houston*, 25 Ark.
183.

The reason for the rule is that the owner has been
deprived of the possession of his property by the act of
the plaintiff in bringing the suit and taking possession of
the property.   If the possession of the property has a
usable value to the owner, upon the recovery of the prop-
erty it is right and just for the plaintiff to compensate
him in damages for thus depriving him of the use and
possession of his property.

As we have already seen, in the instant case there
was no wrongful taking of the property by the road
improvement district, and no analogy can be drawn be-
tween this case and cases of replevin or conversion where
the taking is unlawful.

The question of who breached the contract in the
present case is a very close one, and both parties may
have realized this to be true.   In any event, they must
have known that great damages would ensue as a conse-
quence of the failure to complete the road, which must
be paid by the contractors if they lost the suit, or suffered
by the road district if it lost it.   If the contractors had
been allowed to go on with the work, instead of the road
district, they would have used their equipment in com-
pleting the road, and the fact they did so would not have
entered into the question of damages at all.   The reason
is that the contract in the beginning contemplated that
the contractors should have teams and equipment neces-
sary to construct the road.   If the road district had
completed the road without the use of their teams and
equipment, and the contractors had been compelled to
hold their equipment without using it, they would have
been entitled to prove the actual damages they suffered
on this account.   They have been allowed to recover

on this account. They have been allowed to recover the damages they actually suffered in the present case. from a breach of the contract by the district, and suffered no damages on account of the use of their equipment by the road district, because such use was contemplated in the original contract and agreed to in the supplemental contract.

Again, it may be said that, if the supplemental contract contemplated that the contractors should have a fair rental for their equipment, we do not think that they could recover it in the present case, because they have failed to prove it. It is true that one of the subcontractors testified that the rental value of the teams was $8 per day, and that the principal contractor testified that the steam shovel was worth $500 per month, but we are persuaded that this testimony did not reach to the rental value of the equipment by the year. It cannot be said that the rental value of the teams by the year would be $8 per day. There were sixteen teams, and at $8 per day this would amount to $128 per day, and it will readily be seen that the rental by the year at this rate, even with a reasonable allowance for the expense of feeding the mules, would be far in excess of their market value. The same may be said with regard to the steam shovel. The contractors evidently knew that a long period of time would be needed to complete the road, and in fact 16 months was necessary for that purpose.

If the contractors thought that they were entitled to a fair rental value for their equipment, under the supplemental contract, they should have proved what such value was by the year, and not by the day or by the month. Having failed to prove what the fair rental value of the equipment for a year or for 16 months was, they are not entitled to recover on that theory in this case, because the burden of proof in this respect was upon them.

Some proof was adduced by the contractors tending to show a deterioration in the equipment, but we think

that a preponderance of the evidence shows that the condition of the mules and of the machinery was improved while in the hands of the commissioners. The weight of the evidence shows that the machinery was badly out of repair, and that the mules were poor and ill kept when they were taken over by the commissioners. The machinery was repaired and the mules taken better care of, so that the machinery and mules were in much better condition when they were turned back by the commissioners.

We do not think that the price the equipment was sold for under the mortgage had anything to do with this case. The contractors had mortgaged the mules and machinery to secure debts which they had mainly incurred in work on other improvement districts. Upon failure to pay the mortgage indebtedness, the holder of the mortgage foreclosed, and the price that the mortgaged property sold for at the foreclosure sale cuts no figure at all in this case. The improvement district commissioners had no concern with that case at all, and having turned back the equipment in better condition than it was when received by them, they are not liable for any special damages.

Having failed to establish any rental value of the equipment, we think that the most the contractors should be entitled to recover would be the legal interest on the value of the property from the time it was taken by the commissioners until it was turned back to the contractors or their mortgagees, and this will be the measure of damages allowed in this case.