(1) HILL v. AMERICAN BOOK COMPANY, No. 9598.

(2) AMERICAN BOOK COMPANY v. CHANEY, No. 9600.

Opinion delivered June 14, 1926.

1. STATUTES—PASSAGE OF BILL—SHOWING OF JOURNAL.—The fact that an entry in the Senate journal, showing that a Senate amendment was stricken from a House bill, appears after the recital of the passage of the bill does not show affirmatively that the Senate amendment was stricken from the bill after its passage in the Senate, so as to invalidate Acts 1923, p. 347.

2. EVIDENCE—PAROL EVIDENCE TO CONTRADICT SENATE JOURNAL.—The rule that an act may be held to be invalid when the Senate journal affirmatively shows noncompliance with constitutional requirements in its passage does not authorize parol evidence to contradict the journal, as by showing that a Senate amendment was stricken from a House bill after its passage in the Senate.

3. STATUTES—VALIDITY OF AMENDATORY ACT.—Acts 1925, p. 448, under which members of the State Textbook Commission were appointed, fits into and amends the acts creating the commis-

sion and Acts 1921, p. 326, amending it, and hence is valid, even if Acts 1923, p. 347, which it purports to amend, be invalid.

4. STATES—AUTHORITY OF AGENTS TO MAKE CONTRACTS.—Where, by public law, agents are appointed to enter into a contract for the State, the law under which they act is as much a part of the contract as if transcribed therein.

5. STATUTES—LEGISLATIVE INTENTION.—Crawford & Moses' Dig., §§ 9077, 9080, authorizing the State Textbook Commission to contract for school textbooks, must be construed in the light of the purpose of the Legislature in enacting it.

6. SCHOOL AND SCHOOL DISTRICTS—CONSTRUCTION OF DEPOSITORY ACT.—The object of Crawford & Moses' Dig., §§ 9077, 9080, as amended by Acts 1921, p. 329, being to benefit and protect the people and not the publishers, held that the publishers to whom textbook contracts are awarded must establish a central depository at their own cost, and cannot add the cost to their bid in fixing the retail price required to be printed or stamped on the books.

7. CONSTITUTIONAL LAW—LEGISLATIVE QUESTION.—Whether the construction of the textbook law requiring the cost of a central depository to be charged to the publishers, and not added to the bid in fixing the retail price in fixing the retail price of school books, would make it impossible for some publishers to comply with the law without forfeiting their bonds in other States by necessitating the sale of books in Arkansas at a lower price, is not for the courts to consider, being a question of policy for the Legislature.

8. MANDAMUS—COMPELLING SIGNATURE TO VOID CONTRACT.—Mandamus will not lie to compel the secretary of the School Textbook Commission to sign a void school-book contract.

9. MANDAMUS—NATURE OF ACTS TO BE COMMANDED.—Mandamus confers no new authority, but lies merely to compel a party to do that which it is his duty to do without it, and he must have power to perform the act sought to be compelled.

10. SCHOOLS AND SCHOOL DISTRICTS—VALIDITY OF SCHOOL-BOOK CONTRACT.—As the act creating the State Textbook Commission does not require school-book contracts to be let to the lowest bidder, a contract let to a higher bidder is valid and binding, in the absence of fraud or reckless improvidence indicating no intention to protect the public interest.

11. EVIDENCE—PRESUMPTION.—The fact that a company, which was awarded a school-book contract, made its bid on an erroneous interpretation of the statute, as authorizing the addition of the cost of a central depository to the retail price, does not overcome

the presumption that other book companies made bids according to the legal interpretation of the statute.

(1)    Appeal from Pulaski Circuit. Court, Third Division; *Marvin Harris,* Judge; reversed.

(2)    Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; affirmed.

### STATEMENT BY THE COURT.

The appeals in both of these cases involve the validity of a contract of the State Textbook Commission with the American Book Company for the adoption of Overton's Textbooks on Physiology and Hygiene for use in the public schools for a term of six years from September 1, 1925.

No. 9598 is an appeal by A. B. Hill, as Superintendent of Public Instruction, from a judgment in a mandamus case against him in the Pulaski Circuit Court by the American Book Company, to compel him to sign the contract claimed to have been made by the said book company with the said textbook commission.

No. 9600 is an appeal by the American Book Company from a decree of the Pulaski Chancery Court canceling said contract in a suit brought by certain taxpayers.

The questions presented by the appeal in each case do not require us to do more than to outline the pleadings and to make a general statement of the undisputed facts.

On June 12, 1925, the State Textbook Commission met at the State Capitol and agreed upon a meeting of said commission to be held on July 22, 1925, for the purpose of adopting textbooks on physiology and hygiene and other subjects. Notice of the meeting as required by law was given to the various book companies. The commission met at the State Capitol on July 22, 1925, and, all the members being present, proceeded to open the bids of the various book companies on the subjects to be considered by the commission for adoption. Among the bids submitted were the bids of the American Book Com-

pany and other book publishers on the subjects of physiology and hygiene.

Our statute provides that the textbook commission shall require the publishers to whom contracts are awarded to establish a central depository at Little Rock through which the books, under the provisions of this act, shall be distributed to local dealers in the State. The American Book Company, in making its bid, charged the cost of establishing this central depository in the price of its bid, on the basis that said cost would ultimately be paid by the users of the books in the schools. On the other hand, the other book companies making bids did so in the interpretation of the law that the cost of establishing the central depository should be paid by them and not by the users of the books in the public schools.

The bid of the American Book Company was accepted, and a contract in writing with the bond required by the statute was duly submitted by the American Book Company for the signatures of the various members of the State Textbook Commission.

A. B. Hill, Superintendent of Public Instruction, was a member of the State Textbook Commission, and refused to sign the contract. At a meeting of the State Textbook Commission held on August 1, 1925, said contract and bond of the American Book Company were approved by all of the members of the State Textbook Commission present, except A. B. Hill, Superintendent of Public Instruction, who still refused and declined to execute the contract as secretary of the commission.

The American Book Company filed a petition for mandamus in the Pulaski Circuit Court against the Superintendent of Public Instruction to compel him to sign said contract as secretary of the State Textbook Commission.

The circuit court rendered a judgment requiring A. B. Hill, as State Superintendent of Public Instruction and ex-officio secretary of the State Textbook Com-

mission, to execute and sign the contract of the American Book Company with the said textbook commission for furnishing Overton's Textbooks on Physiology and Hygiene in the public schools of Arkansas for a period of six years beginning September 1, 1925.

Said A. B. Hill has duly prosecuted an appeal to this court.

J. S. Chaney and W. D. Jackson, citizens and tax-payers of the State of Arkansas, brought suit in the Pulaski Chancery Court against the American Book Company and others to cancel said contract as being invalid on account of being made in violation of the provisions of the statute.

The chancellor was of the opinion that the contract was invalid, and the American Book Company and the Arkansas School-book Depository were enjoined from asserting any rights under said contract and from attempting to carry out any of its provisions.

To reverse that decree the American Book Company and the Arkansas School Book Depository have duly prosecuted an appeal to this court.

*H. W. Applegate,* Attorney General, *John L. Carter,* Assistant, *Ben B. Williamson, Utley, Hammock & Clark,* and *Mehaffy & Mehaffy,* for appellant Hill.

*J. W. House, Jr., Murray Seasongood* and *Emerson & Donham,* for appellee American Book Company.

*Tom W. Campbell, amicus curiae.*

HART, J., (after stating the facts).. It is first contended that the contract of the State Textbook Commission with the American Book Company is invalid because it was not made by persons legally constituting the State Textbook Commission.

The members of the commission were duly appointed pursuant to the provisions of act No. 153 of the Legislature of 1925. Acts of 1925, p. 448. This act purports to amend act 379 of the Legislature of 1923. Acts of 1923, p. 347. Act 379 originated in the House, and it is contended that the bill was amended when it reached the

Senate, and that the amendment proposed by the Senate was not stricken from the bill until after its final passage in the Senate. If this was the case, of course, the bill passed by the Senate would not be the bill passed by the House of Representatives, and the act would be invalid. The State journal shows that the bill was amended in the Senate. There is an entry on the Senate journal showing the passage of the bill by the Senate, and immediately following this the same entry shows that the amendments were stricken from the bill. This entry appears on the journal containing a record of the same day's proceedings. The contention here is that, because the part of the entry showing that the amendments were stricken from the bill follows the part showing the passage of the bill, there is an affirmative showing on the journal that the Senate amendment was stricken from the bill after its passage. We do not think so. In *Ewing* v. *McGehee,* 169 Ark. 448, it was held that there is a conclusive presumption of the regularity of the enactment of an enrolled and signed statute, unless the validity is defeated by affirmative recitals in the journal. The entry showing the passage of the bill and that the Senate amendment was stricken from the bill was a part of the proceedings of the same day, and to hold that, because the recital showing that the amendment had been stricken from the bill follows that part of the entry showing the passage of the bill, constitutes an affirmative showing that the proceedings were had in the order in which they appeared on the journal, would be to put form above substance. We do not think that good reason or authority require that the inadvertence or mistake of the journal clerk in making his entries on the journal should control in the matter and thus avoid the proceedings of the Senate. This is especially true when the records show that the bill was duly enrolled and signed as required by law.

Again, it was sought to show by parol evidence that the amendment was stricken from the bill after it had

passed the Senate. As we have already seen, this court has held that an act may be held to be invalid when the journal shows affirmatively that an essential constitutional requirement has not been complied with. That rule does not authorize resort to oral evidence to contradict the journal. A rule of that sort would render legislation uncertain and leave it to the courts to try its validity on questions of constitutional procedure which might vary in different cases according to the proof made. We think that the better view is to hold that act 379 is a valid act.

Moreover, if it should be held invalid, this would not change the result. While act 153 in express language purports to amend act 379, still it is a valid act and capable of enforcement in connection with the original act creating the State Textbook Commission and act 285 of the Acts of 1921 amendatory thereof. Of course, if the constitutional requirements in the passage of act 379 were not complied with, it would be invalid and no part of our laws, and no life could be breathed into it by an act purporting to amend it. Act 153, however, under which the members of the State Textbook Commission were appointed, fits into the original act creating the State Textbook Commission and the act of 1921 amending it, and would amend those acts so far as it is repugnant to them.

This brings us to a consideration of the case on its merits, and the validity or invalidity of the contract in question depends mainly upon the interpretation to be given to §§ 9077 and 9080 of Crawford & Moses' Digest as amended by act 285 of the Legislature of 1921. General Acts of 1921, p. 326. Section 4 of that act amends § 9077 of Crawford & Moses' Digest so as to read as follows:

"The books furnished under any contract shall at all times during the existence of this contract be equal in all respects to the specimen or sample copies furnished with bids; and it shall be the duty of the State Superin-

tendent of Public Instruction to preserve in his office, as the standard of quality and excellence to be maintained in such books during the continuance of said contract, sample copies of all books which have been the basis of any contract, together with the original bid. The retail price and the exchange price of each book adopted shall be printed, labeled, or stamped on the back, or inside cover, of the book. And the commission shall not enter into contract with any person or publisher for any book or books to be used in the public schools of the State, at a retail price above or in excess of the price or prices at which said book or books are furnished by said person or publisher, under contract executed within one (1) year next preceding the making of the contract with the commission, to any State, county, city or other school district in the United States, under similar conditions of distribution and cost of delivery. And it shall be the duty of any contractor to stipulate in his contract that he is not furnishing under contract, executed within one (1) year next preceding, to any State, county, city, or other school district anywhere in the United States at a less retail price than he is furnishing same to the State of Arkansas, under similar conditions of distribution and cost of delivery, and the commission is hereby authorized and directed, at any time it may find any book is being furnished at a lower retail price under contract to any State, county, city, or other school district, as aforesaid, to sue upon the bond of said contractor for the recovery of the difference between the contract retail price and the lower retail price at which they find the book or books to have been sold, and should any contractor fail to execute the terms and provisions of this contract specifically, said commission is hereby authorized, empowered and directed to bring suit in the name of the State of Arkansas upon the bond of such contractor for the recovery of all damages, for the benefit of the public school fund; but nothing herein provided shall be construed so as to prevent said commission and any contractor from

agreeing in any manner to change, alter or amend any contract; provided, a majority of the members of said commission shall agree and think it advisable and for the best interest of the public schools of the State to make such change, alteration or amendment.''

Section 5 amends § 9080 of Crawford & Moses' Digest to read as follows:

''The Textbook Commission shall select and appoint at least one responsible dealer in each county to act as agent or depository for the sale and distribution of such textbooks contracted for by such Textbook Commission; provided that, in counties where there are two county sites, there shall be one such dealer at each county site. The said merchants or dealers shall agree with said Textbook Commission to keep a sufficient supply of said books to supply the demands at all times, and agree to furnish each publisher holding a contract with the State of Arkansas under this act an acceptable personal or surety bond covering the estimated amount of sales to be made by him in any one year, provided such publishers or contractors require such bond, whereupon the said contractors or publishers shall sell to said dealer all books ordered by him at a discount of 15 per cent. from the retail price; provided, that said schoolbook dealer shall pay cash to the contractor or publisher for all books received within sixty days of the shipment of said books; provided, that the contractor shall pay all transportation charges on freight shipments of one hundred pounds or more to the nearest railroad or river station to said dealer, or merchant; except that, during the exchange period provided for in this act, the publishers or contractors shall pay all transportation charges to the nearest railroad or river station to such dealers or merchants, also transportation charges on old books returned to the publishers, on freight shipments of one hundred pounds or more, which are received in exchange for the new books adopted by the commission, and the dealers shall receive ten per cent. of the cash proceeds for handling

said books during such exchange period; provided, that the Textbook Commission shall require the publishers to whom contracts are awarded to establish a central depository at Little Rock, through which the books adopted under the provision of this act shall be distributed to local dealers in the State. The Textbook Commission may delegate to such central depository the authority to select the local dealers, as provided for in this act, and said local dealers shall become responsible to such central depository in the manner provided for in this act, instead of individual publishers. All books adopted under the provisions of this act shall be sold to and delivered to the pupils of this State at the retail and exchange prices agreed upon; provided, that parents or pupils desiring to do so may order books direct from the publishers, or from the central depository, same to be sent by mail or otherwise, transportation prepaid, at the retail contract price, provided the cash accompanies the order.

"Nothing in this section shall be so construed as to prohibit any responsible merchant or dealer, not designated by the Textbook Commission, from buying and selling the books on the same terms and conditions as apply to the designated dealers. Any merchant or dealer who shall demand or receive more than the retail contract price for any such textbooks shall be fined not less than twenty-five dollars ($25) nor more than one hundred dollars ($100), the same to be paid to the State Treasurer and credited to the common school fund."

In the early case of *State* v. *Allis*, 18 Ark. 269, it was held that where, by a public law, agents are appointed to enter into a contract on the part of the State, the law under which they act is as much a part of the contract, when made by the agents, as if it were transcribed in the contract.

In *E. O. Barnett Bros.* v. *Western Assur. Co.*, 143 Ark. 358, this was recognized as the established rule in this State, and our earlier cases on the subject are cited.

The reason is that officers as well as all other interested persons are bound to take notice of the public laws of the State.

In the instant case, the State Textbook Commission had to look to the act under consideration for its authority to make the contract. It was the power under which they were to act, and the book publishers were given notice in the public advertisement for bids of that fact. The act must be construed in the light of the purpose of the General Assembly in enacting it. *Giboney* v. *Rogers,* 32 Ark. 462; *Empire Carbon Works* v. *Barker & Co.,* 132 Ark. 1; and *Logan* v. *State,* 150 Ark. 486.

In *Stafford* v. *Wallace,* 258 U. S. 495, the Supreme Court of the United States had under consideration the Packers and Stockyards Act of 1921, seeking to regulate the business of the packers done in interstate commerce and forbidding them to do a number of acts to control the prices or establish a monopoly in the business. Mr. Chief Justice Taft, in recognition of the duty of the court to consider the act whose validity was in question in the light of the environment in which Congress passed it, said: "It was for Congress to decide, from its general information and from such special evidence as was brought before it, the nature of the evils actually present or threatening, and to take such steps by legislation within its power as it deemed proper to remedy them. It is helpful for us, in interpreting its validity, to know the conditions under which Congress acted."

In *Bowman* v. *Hamlett,* 166 S. W. 1008, the Court of Appeals of Kentucky had under consideration a suit the purpose of which was to test the constitutionality and to obtain an interpretation of an act commonly known as the School Textbook Commission Law. In considering the rules for the guidance of the court in interpreting the act, it was said:

"The one demand for this legislation, the one purpose sought to be accomplished, the one intent of those favoring the act, was to protect the consumer, to procure

for the users of school textbooks the lowest prices for which such books could be sold anywhere. The object of the Legislature was to benefit the last purchasers— the people. The law was enacted in the interest of this class, and of this class alone. The Legislature fully understood that the publishers and the retail dealers could take care of themselves without any assistance from the lawmaking power, if it should be conceded that the lawmaking power could legally assist them, and that no provision of the act was intended to advance the interests of either.''

Bearing in mind that the object of the law creating the State Textbook Commission and authorizing it to provide for the selection of a uniform series of textbooks for the public schools, and to make contracts with book publishers to furnish the same for a term of years, was for the benefit and protection of the people and not of the book publishers, we are of the opinion that it was the intention of the Legislature that the book publishers should establish a central depository at their own cost, and that the cost of its establishment should not be passed on to the people, by an estimate that the cost of the central depository should be added to the cost of the books. It will be noted that the act is specific in its terms. It provides that the retail price of every book should be printed or stamped on the back or inside cover thereof, together with the exchange price between the old and new books of the same grade. It also provides that the exchange price of such books exchanged shall be fixed in the contract, and that such exchange price shall not be above or in excess of the exchange price charged in the contract within a year next preceding upon the same book or books in any other State. The act provides that the Textbook Commission shall select and appoint at least one responsible dealer in each county to act as agent or depository for the sale and distribution of the textbooks contracted for by the Textbook Commission. The publishers or contractors are required to enter into bonds to sell all books ordered by

them at a discount of 15 per cent. The act further provides that the Textbook Commission shall require the publishers to whom contracts are awarded to establish a central depository at Little Rock, through which the books adopted under the provisions of this act shall be distributed to local dealers in the State.

In the interpretation of this clause lies the whole nub of this case. The American Book Company claims that it had a right to estimate the cost of establishing such central depository and add same to its bid in fixing the retail price which should be printed or stamped on the back of the books. The American Book Company estimated that 10 per cent. of the wholesale price of the book would cover this cost, and introduced evidence to show that such estimate was reasonable. In addition, the 15 per cent. allowed by the statute as profit to the county depositories was added. Thus it will be seen that the American Book Company, in making its bid and fixing the retail or contract price which was to be printed or stamped on the back or inside cover of every book sold, took into consideration the wholesale price of the book, the 15 per cent. allowed by the statute to the retailer, and the 10 per cent. which it claims the statute allows for the cost of establishing the central depository. As we have already seen, the statute was passed for the benefit of the people, and its main object was to furnish textbooks at the lowest cost.

In arriving at this result several elements of value would be considered. In the first place would be the initial cost of the book, and its quality as a textbook. In the next place, the contract being for a number of years, frequent changes could not be made in textbooks, and people removing from one part of the State to another part of it would not have to go to the expense of buying additional books. Then, too, the Legislature doubtless had in mind the cost of distributing the books. It recognized that this might vary greatly in different States or even in different sections of the same State. It evidently

had in mind to standardize or to make this cost as uniform as possible. In doing this the cost of transportation and the cost of handling the books would be important factors. The framers of the act had in mind that the publishers of the textbooks on the same subject might, and doubtless would, vary greatly in their estimates of the cost of transportation and of distribution. Hence it was intended to put this matter at rest, so far as the Textbook Commission and the people were concerned, by inserting in the statute the provision requiring the publisher or contractor to establish a central depository at Little Rock through which the books adopted under the provisions of the act should be distributed to the local dealers in the State, and that the cost of the central depository should be paid by the publisher or contractor, and should not be passed on to the users of the books in the public schools.

The decision of the Supreme Court of South Carolina in *Duncan* v. *Heyward,* 54 S. E. 760, by inference supports this construction of the statute. In that case the court had under consideration an act conferring on the State Board of Education the power to prescribe and enforce the use of a uniform series of textbooks and require the publishers, in the discretion of the board, to establish in each county in the State one or more depositories of their books. The court held that, under the general powers conferred upon the State Board of Education to secure uniformity in the use of textbooks, the State Board of Education might provide by contract with publishers of school textbooks that they should maintain at the State Capital a central wholesale depository from which its agents and county depositories might be supplied at a discount of not less than 10 per cent. In discussing the question the court said:

"Unquestionably it is still the duty of the Board of Education to use all reasonable means to secure the lowest possible prices consistent with the successful conduct of the schools; but, as we have seen, there was some

ground for the board to reach the conclusion that, by the use of a central depository, the convenience of patrons might be greatly promoted, with such advantages and savings to the publishers as would enable them to pay 10 per cent. for maintaining it without increasing the price of the books in the hands of the pupil, or 'the first cost' referred to in the act of 1905 (25 St. at Large, p. 877)."

In the case at bar a similar provision was enacted in the law by the Legislature and became a part of the contract. But it is claimed that such a construction would make it impossible for some publishers to comply with our law without forfeiting their bonds in other States, because if the 10 per cent. for the cost of the central depository at Little Rock should be charged to the book publishers or contractors, this would necessarily cause their books to be sold in this State lower than in other States, and thereby cause it to violate its contracts in other States with school textbook commissions. Such considerations can have no place in the courts. They might have been properly addressed to the Legislature as a reason why it would be bad policy to enact a law like the one under consideration, because book publishers would decline to bid with such a provision in force.

In this connection it may be stated that the book publishers were advised of the provisions of the law before they made their bids. Three other book publishers bid on textbooks on the same subjects as those embraced in the contract under consideration in this case, and in. making their bids they interpreted the statute just as we have construed it, and made their bids accordingly. The act was the power under which the textbook commissioners were to act. They could make no contract contrary to its provisions, and, having made a contract in violation of the provisions of the statute, it is void and no action can be maintained on it. *Arkansas Foundry Co.* v. *Stanley,* 150 Ark. 127; *Lewelling* v. *St. Francis County Road Improvement District No. 1,* 158 Ark. 91.

If the contract is void, it follows as a necessary consequence that no action can be maintained on the bond given by the American Book Company. The bond was given to secure the faithful performance of the contract, and if the contract is void and of no effect, the bond must fall with it. If the contract was void, mandamus would not lie to compel A. B. Hill, as Superintendent of Public Instruction, to execute it. As said by Mr. Chief Justice Fuller in *Brownsville v. Loague,* 129 U. S. 493, "mandamus lies to compel a party to do that which it is his duty to do without it. It confers no new authority, and the party to be coerced must have the power to perform the act."

The result of our views is that the circuit court erred in awarding a writ of mandamus to compel A. B. Hill, as Superintendent of Public Instruction and ex-officio secretary of the State Textbook Commission, to execute the contract in question, and for that error the judgment is reversed, and the cause of action is dismissed here.

The decree of the chancellor was correct, and it will therefore be affirmed.

HART, J., (on rehearing). Counsel for appellants assert that "there is not one particle of evidence nor one line of pleading indicating that any other book company, in making up its bid on the textbook in question, interpreted the statute to mean that the book companies should pay the cost of the central depository, and that the same should not be added as a part of the retail price of the book." This makes it necessary for us to state the evidence on this point and give our reasons for so holding.

A. B. Hill was Superintendent of Public Instruction and ex-officio secretary of the State Textbook Commission. Section 9073 of Crawford & Moses' Digest, which is a part of the act creating the State Textbook Commission, provides, in effect, that all bids shall be filed with the State Superintendent of Public Instruction, and that he shall give them to the commission upon their convening.

A. B. Hill was a witness in the case, and the record shows that he had the bids before him while testifying. According to his testimony, the Textbook Commission seriously considered the bids of four book companies on the textbooks under consideration. The Ritchie-Caldwell Company was one of them. Its bid on the first book was 52 cents and on the second 94 cents. That was a total of $1.46 for the two books of the Ritchie-Caldwell Company. The Emerson-Betts Company made a total bid of $1.53 for the two books. The price of the first book was 64 cents and that of the second was 89 cents. The Winslow books were also considered. That company's bid was 64 cents for the first book and 80 cents for the second, making a total of $1.44 for the two books. The bid of the American Book Company was 72 cents for the first and $1 for the second book. This made a total of $1.72 for both books. The witnesses for the American Book Company testified to the effect that the text of its books was superior to that of the other companies submitting bids. On the other hand, the witnesses for appellees testified that the text of the books in question of the other bidders was superior to that of the books of the American Book Company. If this were all the testimony on this branch of the case, the contract of the American Book Company would be a valid and binding contract, in the absence of proof of fraud, or that the contract was so recklessly improvident as to indicate no intention or purpose to protect the public interest within the rule laid down in *McCrory* v. *Richland Township Road Improvement District, post* p. 460, and cases cited. The reason is that the statute creating the State Textbook Commission and regulating its proceedings does not require it to let contracts to the lowest bidder. So, in the absence of a showing to the contrary, the presumption would be that the book companies properly interpreted the law in making their bids and that the Textbook Commission considered the quality of the textbooks in accepting the bid of the American Book Company, although it was higher than the bids of the three other book companies on the same

textbooks which were being considered at the same time. The reason is that every man is presumed to know the statute law of the State and to construe it aright. Broom's Legal Maxims, p. 188.

This testimony, however, does not end the matter. The American Book Company introduced as witnesses several of its principal officers. According to their testimony, the contract of the Arkansas Textbook Commission and the American Book Company provides that the retail price, to the schoolchildren, of Overton's General Physiology shall be $1. Of that amount the American Book Company receives 75 cents, and the other 25 cents goes to pay the local dealer and the central depository and for transportation. According to their testimony, the same contract provides that the price that schoolchildren shall pay for the small physiology (Overton's Personal Hygiene) shall be 72 cents. Of this amount the American Book Company receives 54 cents, and the remaining part of the price goes to the local dealer that sells the books to the children and to the central depository that handles them in wholesale quantities and for transportation.

They further state that they made a contract with Parlette Bros. to handle these books as the central depository in Arkansas. Thus it will be seen that, by their own testimony, they charge the cost of maintaining the central depository to the schoolchildren of the State, and this overcomes the presumption that their bid was made according to a correct interpretation of the law. Of course, the American Book Company had the right to place its own price on its books in making its bid, but it had no right to charge the cost of the central depository to the children of the State, in violation of the provisions of the statute.

The contract which the American Book Company prepared and presented to the State Textbook Commission for the signature of the members thereof contains an express provision that the contract is made under and by virtue of the act of the Legislature creating the State

Textbook Commission and the amendatory acts. It provides that all the provisions of said acts are expressly referred to and made parts of the contract as fully as if the same were set forth at length. Thus it will be seen that the American Book Company placed its own interpretation upon the act in question and is attempting in this case to assert rights based upon that interpretation.

In *Utermehle* v. *Norment,* 197 U. S. 40, the Supreme Court of the United States said that it has been held from the earliest days, in both the Federal and State courts, that a mistake of law, pure and simple, without the addition of any circumstances of fraud or misrepresentation, constitutes no basis for relief at law or in equity, and forms no excuse in favor of the party asserting that he made such mistake. To the same effect see *State* v. *Paup;* 13 Ark. 129; *Thomas* v. *Sypert,* 61 Ark. 575; and *Holloway* v. *Eagle,* 135 Ark. 206.

As pointed out in our original opinion, the statute in question was enacted for the benefit of the schoolchildren of the State, and, if book companies could build up rights based upon their own interpretation of the statute, it had just as well never have been passed. The fact, however, that the American Book Company, by its own evidence, shows that its bid was based upon what it interpreted the statute to mean, does not overcome the presumption that the other book companies made their bids according to the legal interpretation of the statute.

In short, if a person could deliberately act contrary to that which the law, by his own contract, imposed on him, and could thus build up vested rights, this would be done in almost every case, and statutes for the protection of the public in cases like this would be of no benefit whatever.

Again, it is claimed that the court erred in its construction of the statute because of that clause which provides that it shall be the duty of the contractor to stipulate that he is not furnishing, under contract executed within the preceding year, to any State, county, city or other school district anywhere in the United States, at a

less retail price than he is furnishing the same to the State of Arkansas under similar conditions of distribution and cost of delivery.

Now, as we have already seen, the statute does not provide that the textbook contracts shall be let to the lowest bidder. The reason is manifest. The commission is given the power to take into consideration the quality of the text, the plainness of the print and the texture of the paper out of which the books are made. Nevertheless, in order to protect the people as far as possible, the clause just recited was placed in the statute so that the book companies could not have one cost for the central depository in one State and another estimate of cost for a central depository in an adjoining State. As we have already seen, the cost of transportation and the cost of the distribution of the books is all included in the cost of the central depository, and it was the object of the statute to standardize this cost and make it uniform.

The result of our views is that we adhere to our original opinion, and the motion for a rehearing is denied.

McCulloch, C. J., (dissenting). The only prohibition in the statute with reference to the substance of a contract for furnishing schoolbooks is that "the commission shall not enter into contract with any person or publisher for any book or books to be used in the public schools of the State at a retail price above or in excess of the price at which said book or books are furnished by said person or publisher, under contract executed within one year next preceding the making of the contract with the commission, to any State, county, city, or other school district in the United States, under similar conditions of distribution and cost of delivery." There is not a particle of evidence that the contract of American Book Company is in violation of this feature of the statute. There is no evidence that the book company has, within the past year, sold or contracted to sell, books "under similar conditions of distribution and cost of delivery," in any other State of the Union, at prices lower than those stipulated in this contract. The majority of the court do

not, in this opinion, declare the contract void on that ground. But they seem to have found in the statute an implied prohibition against allowing a publisher to include, in his retail price specified in the contract, the expense of maintaining a central depository as a part of the cost of distribution. I am unable to find any such implication in the statute. Neither its language nor the general purpose of the legislation justifies it. The statute does indeed require the contractor to maintain a central depository for the distribution of books, and this means, of course, that the contractor must pay the cost of maintaining the depository, but that is far from prohibiting the contractor from including that expense in the cost of distribution which he adds to his wholesale price in fixing the retail price. The statute also requires the contractor to pay the freight charges on shipments of books from the central depository to the local dealer in each county, but will it be contended that this prohibits the contractor from adding the expense of transportation to his wholesale price in fixing the retail price? Surely not. To do so would be to violate all known customs of trade; in fact, to do violence to essential economic laws. Cost of production, plus reasonable profit and expense of distribution, necessarily fixes the retail price to the consumer. No producer or dealer can survive who omits either of these essentials in fixing his price to the consumer. An intention to violate those rules by prohibiting the inclusion of expense of distribution in fixing the retail price should not be attributed to the lawmakers in the absence of express language to that effect. An analysis of the contract with the book company will, I think, clearly demonstrate the error of the views of the majority in declaring it to be void. There are two books involved in the contract, viz., Overton's Personal Hygiene, and Overton's General Hygiene. The American Book Company is the publisher of each of these books, and the wholesale or publisher's prices are 54 cents and 75 cents, respectively. The publisher has, according to undisputed evidence, only one price on each book—the above whole-

sale prices plus cost of delivery—and the list or retail prices are fixed in accordance with that rule.

The contracts for furnishing books required under our statute are for retail prices at point of delivery to local dealers in each county, with transportation charges prepaid, and the book company in this instance contracted to furnish the books named at 72 cents and $1, respectively, which includes the addition of 25 per cent. of the retail price to the wholesale or factory price to cover the expense of distribution and delivery. This addition of 25 per cent. consists of 15 per cent. allowed by the statute to local dealers and 10 per cent. the estimated expense of transportation charges and maintenance of the central depository. The book company has a contract with the central depository to distribute the books and pay all transportation charges. It is affirmatively proved that this percentage compensation to the central depository is fair and reasonable, and this is undisputed. It is thus seen that, under the contract, the book company receives only its uniform wholesale or factory prices, and that the remainder of the retail prices goes to pay the expense of distribution to purchasers. It would seem very clear that all of the expenses of distribution should be added to the wholesale price, and that the statute does not prohibit it. The fact that some of the bidders did not include the expense of the central depository is of no importance in determining the validity of this contract. Such bidders may have been willing to cheapen the price in order to induce the commission to adopt their books. The price, in comparison with prices of other books on this subject, is not the only consideration, for, in the procedure of adopting schoolbooks, there is no competitive bidding in the ordinary meaning of that term. The bidders are the publishers, and they bid on their own publications—no others. There is no way of comparing bids as to prices. The commission selects the particular book it wants and then makes the best bargain it can as to price. If the price is not satisfactory, another book at a lower price can be selected from some other bidder. The law, speak-

ing through the commission, says to each publisher, if you want to enter into contract for furnishing a book on a given subject, fix a retail price for the book, delivered to all local dealers, pay all distribution charges, including local dealers' compensation fixed by statute, maintenance of central depository, and transportation. The publisher has the right to include in his retail price all of the expenses of distribution, and this does not invalidate the contract unless it is an improvident one.

There is no indication in the opinion of the majority that this contract is an improvident one in fact; it is merely denounced as an unlawful one, in conflict with the statute. I do not think so. No court has ever held that such a contract made under a similar statute is void. The primary purpose of the statute is to secure uniformity of books in use in the schools of the State for a given period of time, so that frequent changes may not be made at the expense or inconvenience of school patrons, and, incidentally, to cheapen the cost of books as far as practical. The purpose is to secure the best books, not the cheapest ones. Quality in subject-matter is not to be sacrificed for sake of economy. No right-minded teacher would think of selecting a book merely because it is the cheapest. All of the school men who testified in this case expressed concurrence in this rule, and the proof shows that such has been the prevailing rule in selecting books by the commission in former years.

Unless the law, as interpreted by the majority of the court in this case, is changed by the Legislature, the commission must, in selecting books, give more consideration to price than to quality.