**FORSGREN et al. v. GILLIOZ.**

**Civ. A. No. 1132.**

United States District Court
W. D. Arkansas, Ft. Smith Division.

July 21, 1954.

Shaw, Jones & Shaw, Ft. Smith, Ark., Shaver, Tackett & Jones, Texarkana, Ark., for plaintiffs.

Daily & Woods, Ft. Smith, Ark., Edward V. Sweeney, Monett, Mo., for defendant.

JOHN E. MILLER, District Judge.

#### Statement

Plaintiffs filed their complaint against defendant in the Circuit Court of Miller County, Arkansas, seeking to recover damages resulting from an alleged breach of contract on the part of the defendant.

Briefly stated, plaintiffs allege that the defendant had a contract with the Arkansas State Highway Department covering certain highway construction between Van Buren, Arkansas, and Alma, Arkansas, in Crawford County; that they subcontracted to do in its entirety part of the work included in the general contract between defendant and the State; that one of the items of work to be performed was the removing and resetting of shrubs in the approximate quantity of 40; that under the prime contract defendant was to be paid $1 each for removing and resetting said shrubs, while under the subcontract plaintiffs were to be paid $5 per shrub by defendant.

That it developed that it was necessary to remove and reset 5,391 shrubs; that defendant under his prime contract and plaintiffs under their subcontract were both entitled and required to remove and reset said shrubs, regardless of any overrun; that the Arkansas State Highway Department so construed the prime contract and that defendant accepted said construction; that plaintiffs proceeded to commence the removal and resetting of said shrubs but that defendant refused to permit plaintiffs to proceed with the work, and instead proceeded to do the work on his own account, receiving therefor $5,391 under the prime contract.

Plaintiffs allege that defendant's actions constituted a breach of the subcontract, and that they are entitled to recover from defendant the sum of $26,-450, less the reasonable cost of removing and resetting 5,290 shrubs. (101 of the 5,391 shrubs were paid for by defendant at the rate of $5 each.) Plaintiffs also allege that defendant is indebted to them in the sum of $1,693.51 for other work done under the subcontract.

On January 18, 1954, the case was removed to the United States District Court, Western District of Arkansas, Texarkana Division.

The defendant on January 27, 1954, filed an answer containing a general denial of the allegations of plaintiffs' complaint. On February 11, 1954, defendant filed an amended answer alleging that both the prime contract and the subcontract provided for the removal and resetting of ornamental shrubs in yards along the right of way; that the 5,290 "shrubs" for which plaintiffs seek damages were not in fact shrubs, but were potted plants and other plants located in and near a greenhouse encroaching upon the right of way; that said plants were not removed and reset within the purview of the prime contract or the subcontract.

Defendant further alleges that plaintiffs refused to move said plants and that defendants arranged for and accomplished the moving of the same; that defendant in fact moved 4,818 potted plants and 3,586 other small plants in and around the greenhouse, and was allowed $5,290 as an estimated reasonable allowance for moving said plants, which were not covered by the prime contract or the subcontract.

On April 2, 1954, a pre-trial conference was had, and upon motion of plaintiffs the case was transferred from the Texarkana Division of the Western District of Arkansas to the Fort Smith Division of said District.

After the case was transferred, another pre-trial conference was had on May 5, 1954, and it was stipulated that defendant is indebted to plaintiffs in the sum of $1,693.51 for work not connected with the shrubs; that plaintiffs are in possession of a check in said amount issued by defendant, but that plaintiffs have not cashed said check because there appears thereon a statement that it is a settlement in full.

On June 8, 1954, defendant filed a second amended answer, repeating the allegations of his first amended answer, and further alleging that plaintiffs are not entitled to recover damages from him since they first breached the subcontract by failing to provide labor and materials during the course of the work, as required by said subcontract, and therefore cannot urge a breach of contract on his part.

Upon the issues as made by the pleadings, the case was tried to the Court, without a jury, on June 14 and 15, 1954, and at the conclusion of the trial the parties were directed to file briefs in support of their respective contentions.

The briefs have been received, and now the Court, having considered the pleadings, ore tenus testimony of the witnesses, depositions, stipulations, exhibits and briefs of the parties, makes and files herein its findings of fact and conclusions of law, separately stated.

### Findings of Fact

**1.**

The plaintiffs are each citizens and residents of the State of Arkansas.

The defendant is a citizen and resident of the State of Missouri.

The amount in controversy, exclusive of interest and costs, exceeds the sum of $3,000.

**2.**

Sometime prior to September 16, 1950, the State of Arkansas entertained bids for certain highway construction work between Van Buren and Alma, Arkansas, said job being designated as Arkansas State Highway Department Job No. 4333, Crawford County, Arkansas. The defendant and plaintiffs were bidders on the job, and had inspected the job site and the plans and profiles prior to making their bids. Defendant was the successful bidder, while plaintiffs were second low bidders.

The contract entered into between defendant and the State contained the following relevant provisions:

"Proposal Schedule (Sheet 6)

"Item No. SP-1064-1, Approximate Quantity 40, Each Removing and Resetting Shrubs at One Dollar and No Cents per Each. Unit Price Bid 1.00. Amount Bid 40.00."

"Special Provision
"—Removing and Resetting Shrubs—

"*Description:*
"This item shall consist of the removing and resetting of shrubs, including rose bushes, in accordance with these specifications and at locations shown on the plans or as designated by the Engineer.

"*Construction Methods:*

"A section of earth of sufficient area and depth to assure the shrub living after it has been reset, shall be removed intact with the roots and body of the shrub. Each shrub shall be reset at a location designated by the Engineer after the location has been properly prepared by grading, loosening of earth, excavating pit, removal of stone or any other unsatisfactory materials, or by any other means necessary to obtain a satisfactory root bed. The shrub shall be carefully set in the new pit and backfill made with suitable material, well tamped and watered, and such other means shall be used in transplanting as are necessary for the continued life and growth of the shrub.

"In removing and resetting, care shall be taken to prevent damage to the shrub and in case any shrub is damaged through carelessness on the part of the Contractor, it shall be replaced by him at his own expense with a shrub equivalent to the one damaged.

"*Basis of Payment:*

"Work performed and accepted under this item will be paid for at the contract unit price each bid for 'Removing and Resetting Shrubs', which price shall be full compensation for removing and resetting shrubs, excavating and backfilling pits, pruning, for furnishing all necessary material, and for all equipment, tools, labor and incidentals necessary to complete the work."

"Section 2—Proposal Requirements and Conditions

"2.1. Contents of Proposal Forms. The Highway Commission will furnish the bidders with proposal forms which will state the location and description of the work to

be done and which will show the approximate estimate of the various quantities and kinds of work to be performed, also materials to be furnished, the amount of proposal guaranty (which must accompany the proposal), the date, the time and the place of the opening of proposals. All papers bound with or attached to the proposal form a necessary part thereof and must not be detached.

"2.2. Interpretation of Approximate Estimate. The Bidder's attention is called to the fact that the estimate of quantities of all work to be done and materials to be furnished under these specifications, as shown on the proposal form, is approximate and is given only as a basis of calculation upon which the award of the contract is to be made. The Commission does not assume any responsibility that the final quantities shall remain in strict accordance with estimated quantities, nor shall the Contractor plead misunderstanding or deception because of such estimate of quantities, or of the character, location or other conditions pertaining thereto.

"2.3. Familiarity with Proposed Work. The Bidder must examine carefully the site of the work contemplated, the proposal, plans, specifications, instructions to bidders, special provisions, and contract form before submitting his proposal, and otherwise familiarize himself with the character and extent of the proposed construction. Submission of a proposal shall be considered prima facie evidence that the Bidder has made such examination."

"Section 4—Scope of the Work

"4.3. Alterations of Plans or Character of Work. The Commission shall have the right to increase or decrease the extent of the work, to change the location or gradient or the dimensions of any part of the work, provided that the length of the improvement is not increased or decreased in excess of 25 per cent of the length as determined by the Contract award, or that the quantities of work to be done or the materials to be furnished are not increased or decreased in money value in excess of 25 per cent of the total as determined by the Contract award. Such changes shall not be considered as a waiver of any conditions of the Contract nor invalidate any of the provisions thereof. The Contractor shall perform the work as increased or decreased within the qualifying limits named and no allowance will be made for anticipated profits on increases or decreases so incurred.

"4.4. Extra Work. The Contractor, if required by the Engineer, shall perform unforeseen work, for which there is no quantity and price included in the Contract, or where increases or decreases in quantities are made in excess of the amounts set out in Paragraph 4.3, or whenever it is deemed necessary or desirable to further complete the work as contemplated. Such extra work shall be performed in accordance with the specifications and as directed; provided, however, that before any extra work is started a supplemental agreement shall be signed by both contracting parties, or a written order from the Engineer to do the work on a Force Account basis given the Contractor."

"Section 5—Control of the Work

"5.1. Authority of Engineer. The work shall be done under the direct supervision of the Engineer who is placed in charge of the work by the Chief Engineer, and to his satisfaction. The Engineer shall decide any and all questions which may arise as to the acceptability of materials furnished and work performed, and as to the manner of performance and rate of progress of the work, and shall decide all questions which may arise as to the interpretation of the plans and specifications, and all ques-

tions as to the acceptable fulfillment of the Contract on the part of the Contractor, and as to disputes and mutual rights between the Contractor, and Subcontractors under these specifications, affecting the integrity of the work, and as to compensation. The Engineer shall determine the amount and quantity of the several kinds of work performed and materials furnished which are to be paid for under the Contract, and such decisions and estimate shall be final and conclusive, and such estimate, in case any question arises, shall be a condition precedent to the right of the Contractor to receive any money due him under the Contract. He shall have executive authority to enforce and make effective such decisions and orders as the Contractor fails promptly to carry out.

"5.2. Chief Engineer to be Referee. In order to prevent misunderstanding and litigation, it is mutually agreed by both parties to this Contract that the Chief Engineer shall act as referee in all questions arising under the terms of the contract between the parties hereto, and that the decision of the Chief Engineer, in such cases, shall be final and binding upon both parties alike."

"VII. Subletting or Assigning the Contract

"The contractor shall perform with his own organization work amounting to not less than 50 percent of the remainder obtained by subtracting from the total original contract value the sum of any items designated in the contract as 'Specialty Items.'

"Any items that have been selected as 'Specialty Items' for the contract are listed as such in the Special Provisions found elsewhere in the contract.

"No portion of the contract shall be sublet, assigned or otherwise disposed of except with the written consent of the contracting officer or his authorized representative. Requests for permission to sublet, assign or otherwise dispose of any portion of the contract shall be in writing and accompanied by a showing that the organization which will perform the work is particularly experienced and equipped for such work. The contractor shall give assurance that the minimum wage for labor as stated in his proposal shall apply to labor performed on all work sublet, assigned or otherwise disposed of in any way. Consent to sublet, assign or otherwise dispose of any portion of the contract shall not be construed to relieve the contractor of any responsibility for the fulfillment of the contract."

Thereafter, on September 16, 1950, defendant entered into the following subcontract with plaintiffs:

"Contract Agreement

"This contract agreement entered into on this the *16th of Sept. 1950* by and between M. E. Gillioz an individual of Monett, Missouri, party of the first part, and Forsgren Brothers, *a partnership* of Ft. Smith, Arkansas, party of the second part.

"Witnesseth, the parties above mentioned have on this date entered into an agreement whereby the party of the second part agrees to perform in their entireity (entirety) certain items of work covered by the party of the first part's general contract with the Arkansas State Highway Department, on Job No. 4333, Crawford County, Arkansas.

"The party of the second part agrees to do in their entireity (entirety) certain items of work, covered by the party of the first part's general contract with the Arkansas State Highway Department on Job No. 4333, Crawford County, Ark. at unit prices stipulated in the attached list.

"The party of the second part agrees to furnish all labor, materials, equipment, supplies, insurance,

etc. as required under the terms of the general contract. The party of the second part further agrees to reimburse the party of the first part for the entire cost of the bond, for his portion of the work embraced in this agreement, same to be *deducted from the party* of the second part's estimates, as received by the party of the first part and perform the above work in strict accordance with the plans, specifications and special provisions, and to the satisfaction of the Arkansas State Highway Department's Engineers.

"It is also hereby agreed that the party of the second part will carry all necessary workmen's compensation, public liability and property damage insurance, and any other class of insurance required by the party of the first part, and to pay the premiums thereon, and submit to the party of the first part certificate of insurance evidencing that the above coverage has been obtained before entering into the performance of any part of this contract.

"It is hereby agreed that the party of the first part is to pay the party of the second part on monthly estimates as received from the Arkansas State Highway Department, and payment is to be made within four days after receipt of moneys from the Arkansas Highway Department and that the party of the first part is to retain the ten per cent withheld by the Arkansas State Highway Department until the project is completed and accepted by the Arkansas State Highway Department, at which time the party of the first part agrees to pay the party of the second part the ten per cent retent, when same has been received from the Arkansas State Highway Department.

"On completion of the items in question, the party of the second part, if requested by the party of the first part will furnish the party of the first part a statement stating that all bills for labor, materials, supplies, etc. have been disposed of.

"The party of the second part agrees to start work on their part of the work on or before Oct. 1, 1950 and to complete same in the time specified in the party of the first part's general contract.

"All of the terms and conditions of the contract between the Arkansas State Highway Department and the party of the first part, as required by the plans, specifications and special provisions, all of which are hereby made a part of this contract agreement, and shall be considered as if attached and bound hereto.

"The party of the second part hereby agrees that he will not assign or sublet any portion of this contract without the written permission of the party of the first part.

"/s/ M. E. Gillioz

"M. E. Gillioz—Party of the first part

"Forsgren Brothers, Party of the second part

"By /s/ Gilbert Forsgren (Partner)

"Subscribed and sworn to before me a Notary Public on this the Sept. 16, 1950.

"(Seal)

"My Commission Expires December 4, 1950.

"/s/ L. C. Moret

"Notary Public

"Subscribed and sworn to before me a Notary Public on this Sept. 16, 1950.

"(Seal)

"My Commission Expires December 4, 1950.

"/s/ L. C. Moret

"Notary Public"

The detailed list of work to be done by plaintiffs was attached to the contract, and the removing and resetting of the shrubs was listed as 40, each, at $5 per shrub.

3.

Under the subcontract plaintiffs were to do all the work covered by the prime

contract except the items of house moving, and well and cistern moving or digging. The work, subcontracted, of course, was much more than the 50% defendant was entitled to sublet under the prime contract (See part VII of the general contract, supra), and apparently in order to evade this provision of the prime contract the parties agreed to designate one of the plaintiffs, Gilbert Forsgren, as defendant's superintendent on the job and to perform the work as though it were being done by defendant, rather than by plaintiffs. The following letter from defendant to Mr. A. E. Johnson, Chief Engineer of the Arkansas State Highway Department, illustrates the manner in which the parties were pretending to perform the work:

"October 4, 1950.
"Re: Job No. 4333, Van Buren—Alma Road.
"Mr. A. E. Johnson,
"Chief Engineer,
"Arkansas State Highway Department,
"Highway Building,
"Little Rock, Ark.

"Dear Mr. Johnson:

"Upon my return from a trip I found your letter dated Sept. 29th., 1950, awaiting me on my desk, with reference to the subcontracting, etc. on the above captioned project.

"For your information, this is to advise that I have employed Mr. Gilbert Forsgren of Ft. Smith, Arkansas to supervise the above job in its entirety. I have also rented the necessary equipment to do all of the work on the above captioned project, except the house moving equipment, from Forsgren Brothers, a co-partnership of Ft. Smith, Arkansas.

"Mr. Gilbert Forsgren will be my representative on the job, and all matters pertaining to the project should be taken up with him direct. Insofar as the working conditions on the job are concerned those matters should be taken up with my superintendent on the job, Mr. Gilbert Forsgren, P O Box 368, Ft. Smith, Arkansas, for his further handling.

"This is to advise that I have sublet the house moving, pulling and redriving wells, reconstructing dug wells, bored wells and reconstructing of cisterns to Mr. E. L. Heisten of Carthage, Missouri. If you require a copy of this subcontract, I will be glad to mail you a copy of same at your request.

"I hope the above is the information you desire.

"Yours very truly,

"MEG-k     M. E. Gillioz."

Apparently the State had full knowledge of the falsity of the letter, and of the true facts, i. e., that defendant had subcontracted to plaintiffs more than the 50% permitted by the general contract, and yet the State acquiesced and made no complaint concerning this breach of the prime contract.

**4.**

Plaintiffs were required under the subcontract "to furnish all labor, materials, equipment, supplies, insurance, etc. as required under the terms of the general contract. * * * "

Moreover, upon completion of the work, plaintiffs, if requested by defendant, were required to "furnish the party of the first part (defendant) a statement stating that all bills for labor, materials, supplies, etc. have been disposed of."

Notwithstanding these provisions of the subcontract, plaintiffs did not furnish the labor and materials during the course of the work. However, there was no evidence that defendant at any time seriously complained of the failure of plaintiffs to comply with the subcontract, and, in fact, the payment for labor and the purchase of materials by defendant was probably a part of the scheme to evade the provision of the prime contract prohibiting the subcontracting of more than 50% of the work.

**5.**

On October 25, 1950, E. L. Heisten, who held the subcontract for the removal of houses from the right of way and for the digging of wells and cisterns, was proceeding with his work when he discovered that some of the buildings of the Harwell Nursery were situated on the right of way. There were literally thousands of small potted plants and other plants in and around the nursery buildings which had to be moved before the buildings could be moved from the right of way. The situation was reported to J. K. McClinton, Resident Engineer, by Frank Weiss, an inspector on the job. McClinton went to the nursery and, while he was considering the situation, one of the plaintiffs, Eugene Forsgren, came by while going to some other place and he discussed the matter with McClinton. The testimony does not clearly disclose what was said by McClinton and by Forsgren or whether any definite conclusion was reached about the removal of the plants in order that Heisten could proceed with the removal of the buildings. McClinton testified that he understood Eugene Forsgren to say that the plaintiffs did not want anything to do with the nursery plants, although Eugene Forsgren denies that he made such a statement, but it does appear that Eugene Forsgren knew that the situation existed and that the plants had to be removed from the buildings before Heisten could proceed to remove the buildings from the right of way.

The nursery plants were not shown on the plans and specifications and McClinton did not know who should remove them. He attempted to contact the plaintiff, Gilbert Forsgren, who was in charge of the job for plaintiffs as well as being in charge for the defendant, Gillioz. Gilbert Forsgren was out of town and could not be reached, so McClinton attempted to obtain a ruling from Mr. Mashburn, the Construction Engineer, but was unsuccessful in doing so as is disclosed by the following entry that McClinton made in the Resident Engineer's Diary under the date of October 25, 1950:

"Resident Engineer called Mr. Mashburn at 6 p. m. requesting ruling on the three thousand shrubs to be moved at the nursery. Have bid item for moving and resetting shrubs at $1.00 each. However, the shrubs at the nursery were not included. Mr. Mashburn was unable to give ruling on this at this time."

Apparently, in order to not delay the work of removing the buildings, Mr. Heisten offered to move the plants himself. McClinton then called the defendant and told him about the situation and that he had been unable to obtain a ruling from the Construction Engineer as to whose duty it was to remove the nursery plants, and also advised the defendant that Eugene Forsgren had stated that Forsgren Brothers wanted nothing to do with the nursery, and that Heisten was ready and willing to move them. The defendant told McClinton that he was in charge and that if the plaintiffs would not move the plants he should turn them over to Heisten to move. Then it was that McClinton told Heisten that he could move the plants but he did not know whether or how he would be paid for the work. McClinton did not direct Heisten to move the plants. Nevertheless, Heisten said that he would risk getting paid for the work and began the job of removing the nursery plants.

Many of the plants were potted plants, some of which were on benches in the three nursery buildings and many of which were setting on the ground. They were in small receptacles and as many as four at a time could be carried by a person. They were taken from the buildings and placed on a truck and the truck was then driven approximately one hundred feet off the right of way. The potted plants were unloaded and placed on the ground under the supervision of the nurseryman who was present at the time.

In addition to the potted plants, which ranged in size from three or four inches

high to several inches, there were a large number of small plants being held for sale and which were heeled in and, of course, were growing in and around the nursery buildings. To remove these plants it was necessary to dig them up and, after being dug up, many of them were wrapped in burlap and removed to rows that had been prepared by the nurseryman and there they were temporarily set or heeled in rows to be held by the nurseryman until sold in due course of trade. All of these plants, both potted and otherwise, were being held for sale and in fact were being sold to customers by the nurseryman during the entire process of removing them.

It was the duty of Mr. Weiss, the inspector, to count the plants as they were moved, and he attempted to do so, and his testimony indicated that approximately 4,818 potted plants and 3,586 dug plants were moved by Mr. Heisten.

There is other testimony tending to show that the nursery contained many more plants. Heisten did not know how many he removed and neither party called the nurseryman as a witness.

At the time the subcontract was entered into between the plaintiffs and the defendant, the defendant knew nothing about the Harwell Nursery or the plants in and about the nursery. The plaintiff, Gilbert Forsgren, knew the location of the nursery but did not know whether any of the plants encroached upon the right of way. He did not say that he knew the buildings contained potted plants, but if he knew that the nursery was there, he evidently knew that some plants were situated in the buildings.

The plans and profiles upon which the defendant bid the job and also upon which the subcontract was let to the plaintiffs showed twenty shrubs to be on the property of S. S. Kellogg and twenty shrubs on the property of Buss Jack. These were the only locations of shrubs shown on the plans and profiles.

When Heisten was about half finished with the work of removing the plants, Gilbert Forsgren returned to the job and talked to him about the plants at the nursery. At that time Forsgren informed Heisten that he considered the plants to be an item covered by the plaintiffs' subcontract, but Heisten continued to move the plants and advised Forsgren that he (Heisten) would be paid for moving them. Forsgren then told Heisten, "That is just fine and dandy. Gillioz will pay us for them too." Forsgren made no attempt to stop Heisten from continuing the work of moving the plants.

The reasonable cost of moving the plants did not exceed $1,000, although the defendant apparently paid Heisten $2,000 for the work.

6.

On October 28, 1950, J. C. Perkins, Assistant Construction Engineer, wrote McClinton as follows:

"State of Arkansas
"Highway Department
"Highway Building
"Little Rock
         "October 28, 1950
         "Job No. 4333
         "FAP F–216(6)
              "FI–216(7)
"Mr. J. K. McClinton
"Resident Engineer
"P. O. Box #56
"Van Buren, Arkansas
"Dear Sir:
    "Reference is made to your telephone conversation with Mr. Ross in regard to the removing and resetting shrubs on the above captioned job.
    "The Contractor has a bid on this item for $1.00 each for removing and resetting shrubs and it seems to me he will be entitled to be paid at this rate. Regardless of no. moved.
         "Yours very truly,
         "E. E. Mashburn
         "Construction Engineer
         "/s/ J. C. Perkins
         "J. C. Perkins
         "Asst. Construction Engineer
"JCP-nwk"

At the time this letter was written Perkins had very little knowledge about

the situation at the nursery. He thought there were three or four thousand plants, some of them being potted plants, that they were to be removed and reset, and that the easiest way to handle the matter was to consider the plants overruns of the original contract item of removing and resetting shrubs.

After receiving this letter, McClinton informed Heisten that he would allow $1 each for the dug plants but would only allow $1 for each set of four potted plants, i. e., 25¢ each for potted plants. McClinton did this on his own responsibility because he thought it would be a virtual fraud upon the State to allow $1 each for moving the potted plants.

### 7.

Customarily there are many overruns and underruns encountered during the progress of highway construction work. In the instant case there were a number of overruns on various items of work, and when the moving of the plants was completed McClinton turned in a figure of 5,391 as being the number of plants moved, said plants having been treated as an overrun by McClinton and Perkins in order to avoid the red tape and delay that would be caused by the obtaining of a plan change.

How this arbitrary figure of 5,391 was arrived at no one knows. Neither McClinton, Weiss, nor anyone else could explain the figure, but it evidently was reached in an attempt to allow defendant $1 each for dug plants and 25¢ each for potted plants, because it is clear that a much larger number of plants was moved than the 5,391 turned in by McClinton.

In any event the State Highway Department accepted McClinton's figure and paid defendant $5,391 for the moving of 5,391 shrubs at $1 each. Defendant accepted this payment and made no complaint because he was not paid $1.00 each for all of the plants that were moved (approximately 8,404 according to Weiss).

### 8.

Having learned that defendant had been allowed $5,391 for moving the plants, Gilbert Forsgren wrote defendant several letters contending that plaintiffs should be paid for the moving of said plants. The following excerpts from these letters indicate the contentions of the parties with regard to the plants:

"* * * Regarding the shrubs, I talked with Mr. Heisten and he told me it cost him between $500.00 and $600.00 to move these shrubs. When you settle with him I would not advance him over $1,000.00 or $1,100.00 on the shrubs. If this is not satisfactory with him let him do the collecting from Forsgren Brothers, as no one had the right to give him authority except Forsgren Brothers. The more I get to know Mr. Heisten the more I think he was just trying to get by doing one of our items that had a nice profit in it, and we do not intend to give him two or three thousand dollars of money due us. I honestly believe when he leaves this job that all of our troubles will be settled * * *." Letter of November 16, 1950, from Gilbert Forsgren to M. E. Gillioz.

"* * * we noticed you did not include any of the shrubs; and since this is part of our contract we expect you to pay us for these shrubs." Letter of December 27, 1950, from Gilbert Forsgren to M. E. Gillioz.

On December 29, 1950, Gillioz replied to Forsgren's letter of December 27 as follows:

"I note what you have to say in regards to the estimate, and further in regards to the payment for the removal of shrubs. The reason nothing was said about the shrubs was because Mr. Heisten had moved those shrubs and naturally I have furnished him some money on the removal of same. Naturally, I do not intend to pay Mr. Heisten the total amount that was allowed for the removal of those shrubs, but he is entitled to something, and that

will have to be settled by and between yourself, Mr. Heisten and the writer, bringing in on the deal Mr. McClinton. There seems to be some confusion in regards to the shrubs, as you well understand it, and this is a matter that will have to be settled at a latter date, when we can come to some agreement with all of the parties concerned."

On January 5, 1951, Forsgren again wrote Gillioz:

"Getting back to the shrubs mentioned in your last letter. No one, not even yourself, had any right without first obtaining permission from Forsgren Brothers to move these shrubs, as it is definitely written up in our contract between M. E. Gillioz and Forsgren Brothers. I have since found out that Mr. Heisten did not get permission from any one to move the shrubs, but advised Mr. McClinton he was going ahead any way, and if this is true he is not entitled to one dime. We are not writing any more in regards to these shrubs as there is no question in our mind but what this money is due us some time or other."

On July 3, 1951, Forsgren wrote Gillioz:

"When you make out the Estimate for June 30, 1951, we would appreciate it very much if the item for removing and resetting shrubs would be included. We have been out quite a sum for labor in removing and replacing these shrubs and can't see why we are not due credit for this work as the Arkansas Highway Department has allowed it on their estimates to you. At one time you mentioned talking about this work when we could all get together, so seems as if we should get this settled in the near future."

Plaintiffs actually had not expended a penny for labor in moving the plants, and at the trial Gilbert Forsgren was unable to offer a satisfactory explanation for this statement in his letter of July 3, 1951, to Gillioz.

On September 18, 1951, Forsgren wrote Gillioz:

"Mr. Gillioz, getting back to the shrubs on this job, you owe us a balance of $4,886.00, which is 100% due Forsgren Brothers for this work. If you do not intend to pay for these shrubs we will be forced to collect $5.00 for each shrub moved as written in our contract."

9.

Plaintiffs removed and reset 101 shrubs at places other than the nursery, and were paid $5 each, or a total of $505, by defendant for doing that work. These 101 shrubs were moved in accordance with the specifications contained in the Special Provisions of the prime contract, heretofore set out in Finding of Fact No. 2. None of the plants at the nursery were removed and reset in accordance with said Special Provisions, and defendant has paid plaintiffs nothing for the plants that were moved at the nursery by Heisten.

10.

McClinton's relations with defendant were much closer than should be expected of a resident engineer in his dealings with the general contractor. That is, McClinton visited defendant in Monett, Missouri, several times, assisted him in hiring men to dig, move and drill wells and cisterns, assisted him in obtaining another house mover after Heisten had left. (Heisten's work had not been satisfactory and evidently he left the job before defendant could fire or replace him), aided him in connection with claims made by landowners, and accepted $600 from a partnership of which defendant is a partner for the services he had rendered to defendant while acting as resident engineer.

11.

During the course of the work plaintiffs improperly billed defendant for 278 yards of concrete, but defendant discovered the discrepancy and did not pay plaintiffs for said concrete.

242

## 12.

Defendant is indebted to plaintiffs in the sum of $1,693.51, for work done on the job and not connected with the plants or shrubs in question.

### Discussion

To say the least, this is an unusual case. In the first instance plaintiffs and the defendant knowingly entered into a subcontract which was admittedly in violation of the terms of the prime contract with regard to the permissible amount of work that could be subcontracted, and the State Highway Department evidently condoned and acquiesced in this conduct of the parties. Not only did the parties proceed contrary to the provisions of the prime contract, but they also in effect ignored portions of the subcontract, particularly with reference to the furnishing of labor and materials by plaintiffs. Moreover, the plaintiff, Gilbert Forsgren, purported to act as defendant's superintendent for the whole job, while also acting as superintendent for his own partnership, Forsgren Bros. To like effect, the Resident Engineer, J. K. McClinton, although representing the State of Arkansas on the job, also performed certain services for defendant and was paid $600 therefor. Many other unusual facts appear in the case, but the Court is of the opinion that most, if not all, of these facts are irrelevant to the real issues in the case.

The primary issues before the Court are (1) whether the plants at the Harwell Nursery were covered by the subcontract and the prime contract, and (2) if the plants were not originally covered by the terms of the said contracts, whether the construction of the prime contract by the Construction Engineer (determining that the plants were overruns covered by the contract) is binding upon the parties and upon the Court, especially where the defendant accepted payment under the prime contract for the moving of said plants.

Plaintiffs contend that the decision of the Construction Engineer is binding on the parties and establishes the fact that the plants were covered by the subcontract. Plaintiffs also contend that the action of the parties to the prime contract is indicative of the fact that the defendant and the State Highway Department construed the prime contract as covering the plants, that the actions and conduct of the parties are of controlling significance in the determination of the meaning of the contract, and that if the plants were covered by the prime contract they were likewise covered by the subcontract.

Defendant contends that the plants at the nursery were not covered by the prime contract or the subcontract, and that the decision by the Construction Engineer is not binding upon the parties or the Court.

The answer to the first issue, i. e., whether the plants at the nursery originally were covered by the prime contract or the subcontract, is patently clear. Under no stretch of the imagination could the small potted plants and other small plants at the nursery be said to be "shrubs" within the meaning of the prime contract or the subcontract. A casual glance at the Special Provision of the prime contract governing the method of "Removing and Resetting Shrubs" (see Finding of Fact No. 2, supra) is convincing that the contract contemplates the moving of ornamental shrubs, including rose bushes, located on the right of way, and does not contemplate the moving of potted plants and other small plants which are temporarily heeled in and at the time are being sold on the market. As a matter of fact, not a one of the plants at the nursery was removed and reset in accordance with the Special Provision of the prime contract above mentioned. In addition, the plants were not even shown on the plans and profiles prepared by the State Highway Department, the only shrubs shown being the approximate quantity of 40 at other locations, and at the time the subcontract was executed neither the plaintiffs nor the defendant knew or anticipated that there were thousands of small plants at the nursery that would

have to be moved. There are other factors supporting the Court's opinion on this subject, but since plaintiffs make no serious contention that the said plants were intended to be covered by the subcontract the Court will not prolong its discussion of this issue.

█ The primary issue for determination is whether the decision of the Construction Engineer, E. E. Mashburn, acting through the Assistant Construction Engineer, J. C. Perkins, that the plants were covered by the prime contract, is binding upon the Court. Neither plaintiffs nor the defendant cited any authorities supporting their respective contentions on this issue, but the Court's research has disclosed that it is not bound by the decision of the Construction Engineer.

The Arkansas law is well stated in Drainage District No. 5 of Lonoke County v. Kochtitzky, 146 Ark. 494, at page 502, 226 S.W. 172, at page 174, wherein the Court said:

"The contract contains the following clause with respect to the power of the engineer:

" 'It is mutually covenanted and agreed by and between the said parties hereto that, to prevent disputes or misunderstandings between them in relation to the stipulations and provisions contained in this agreement, or as to the true intent and meaning thereof, and of the plans and specifications hereunto attached, and of other plans pertaining thereto, or as to the performance of said contract by either of said parties and for the speedy settlement of such disputes as may occur, the engineer personally who may be such at the time shall be, and he is hereby made, constituted, and appointed, sole arbitrator to finally decide all such questions and matters.'

"It is contended that this clause of the contract gave the engineer the authority to interpret the contract and to decide all questions thereunder which would be conclusive upon the parties, and that the decision of the engineer has been against appellee's contention in regard to his price for the excess yardage. The contract is plain and unambiguous concerning the power to change the plans, and, as before stated, the testimony clearly establishes the fact that the change with respect to lateral B did not conform to the capacity of the equipment then in operation. *The engineer had the authority to settle disputed questions of fact arising under the contract or to interpret ambiguities in the contract which were dependent upon issues of fact, but he was not clothed with authority to change the contract except in the particulars mentioned, and therefore could not change it by interpretations.* * * * Williams v. [Board of Directors of] Carden's Bottom Levee Dist., 100 Ark. 166, 139 S.W. 1136. There is a distinction between the power of the engineer with respect to interpretation of the plans and specifications and as to the contract itself. The former is supposed to be the work of the engineer, and it is proper in case of dispute to refer such interpretation to him, but, as before stated, *the rights of the parties are fixed by the contract itself, and it is a question for the courts, and not for the engineer, to determine what those rights are, except to the extent that the parties may leave to the engineer the settlement of questions of fact relating to the quantity, quality, or manner of the construction of the work to be done under the contract."* (Emphasis added.)

See also, S. J. Groves & Sons Co. v. Warren, 77 U.S.App.D.C. 347, 135 F.2d 264; Connelly v. Parkes, 160 Ark. 496, 500, 255 S.W. 22; Lewelling & Price-Williams v. St. Francis County Road Improvement District No. 1, 158 Ark. 91, 104, 250 S.W. 1.

The reasoning of the Court in the Kochtitzky case, supra, is equally applicable in the instant case, and the re-

maining question is whether the decision of the Construction Engineer was upon a question of fact or upon a question of law.

The Court is convinced that the question was one of law rather than one of fact. In Central Nebraska Public Power & Irrigation Dist. v. Tobin Quarries, Inc., 8 Cir., 157 F.2d 482, at page 486, the Court said:

"The defendant insists that the problem presented here is one of fact to be resolved by the engineer under the authority of Article IV. This same contention was made in the district court, and the court found against the defendant on it. The court, citing Nebraska authorities, applied the rule that 'Where the terms of the contract are admitted and are not in conflict and are unaided by parole evidence, their interpretation presents not a question of fact, but one of law.' If the question here related to the gradations of a specific quantity of gravel furnished by the plaintiff, a question of fact would be presented. That is not the question, however. The question presented by the issue relates to the meaning of the word 'graded' as used in the contract. * * * The dispute is not about the gradations of the gravel furnished. The dispute is about the gradations required by the contract, that is, by section 2.4 of the specifications. * * * Such a controversy presents a question of law, not one of fact."

See also the District Court's opinion, Tobin Quarries, Inc. v. Central Nebraska Public Power & Irrigation Dist., D.C. Neb., 64 F.Supp. 200.

In the instant case the issue relates to the meaning of the word "shrubs" as used in the prime contract and the subcontract, and this presents an issue of law to be decided by the Court.

As a matter of fact, it would be, in the opinion of the Court, an injustice if the Court were required to accept the decision of the Construction Engineer, acting through the Assistant Construction Engineer, J. C. Perkins, who admittedly acted with practically no knowledge of the facts, when it is so clearly evident that neither the prime contract nor the subcontract covered the plants at the nursery. No doubt what actually happened was that the representatives of the State Highway Department knew that the plants were unforeseen items which required a supplemental contract or plan change under Section 4.4 of the General Requirements and Covenants of the prime contract. But, in order to avoid the red tape and delay that would be necessitated by a plan change or supplemental contract, said representatives decided to treat the plants as an overrun of the original contract item of removing and resetting shrubs.

As heretofore stated, the Court is convinced that the plants at the nursery were not covered by the prime contract or the subcontract, and this is true regardless of the decision of the Construction Engineer. And the fact that defendant was paid for the moving of the plants does not alter the situation, especially since defendant was paid upon an arbitrary basis set up by the Resident Engineer and was not paid $1 each for the plants that were moved, as would have been the case had the plants been shrubs within the meaning of the prime contract.

In conclusion, since the plants in question were not covered by the subcontract, plaintiffs had no right to move said plants and have no standing to complain about the moving of the plants by Heisten or anyone else.

Defendants also advance two other defenses. (1) That the defendant did not refuse to permit plaintiffs to move the plants, and (2) that plaintiffs had previously breached the subcontract by failing to furnish labor and materials, and that they are thereby precluded from prosecuting the instant suit. However, in view of the Court's conclusion that the plants were not covered by the prime contract or the subcontract, it is unnecessary to pass on the remaining contentions of defendant.

Conclusions of Law

1.

The Court has jurisdiction of the parties to and the subject matter of this cause of action.

2.

The defendant, M. E. Gillioz, is indebted to the plaintiffs in the sum of $1,693.51, represented by the check of defendant now in the possession of plaintiffs, and plaintiffs are entitled to recover said sum with interest thereon at 6% per annum from October 16, 1952, together with their costs.

3.

The defendant did not breach his subcontract with plaintiffs, and plaintiffs are not entitled to recover damages because of the removal of the plants situated at the Harwell Nursery.

A judgment in accordance with the above should be entered.